ADVISORY OPINION *re* CONSTITUTIONALITY
OF PA 1966, NO 346.

OPINION OF THE COURT.

1. CONSTITUTIONAL LAW—POWER OF STATE TO BORROW MONEY.
   The State is without authority to borrow money except as authority is constitutionally granted (Const 1963, art 9, § 12).

2. SAME—STATE BORROWING.
   The State is constitutionally permitted to borrow in only 4 specific instances: (1) short term borrowing to meet current appropriations, (2) long term borrowing adopted by 2/3 of the legislature, and approved by the electorate, (3) borrowing for the making of loans to school districts, and (4) borrowing to retire Mackinac bridge bonds (Const 1963, art 9, §§ 14–16; schedule, § 14).

3. GUARANTY—SURETY—STATE—CONSTITUTIONAL LAW.
   The State of Michigan is specifically prohibited from becoming a guarantor or surety for anyone (Const 1963, art 9, § 18).

4. CORPORATIONS—STATE—BORROWING.
   Public corporations, unlike the State, have general power to borrow money except as prohibited by the Constitution and by the statutes (Const 1963, art 9, § 13).

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 43 Am Jur, Public Securities and Obligations § 17.
[3, 7, 29, 30] 43 Am Jur, Public Securities and Obligations § 19.
[4, 6] 38 Am Jur, Municipal Corporations § 408 *et seq.*
[5, 33] 38 Am Jur, Municipal Corporations § 381 *et seq.*
[8, 9, 11, 14, 16–19, 21, 22, 24–28, 31, 32, 35–40] 42 Am Jur, Public Housing Laws § 2.
[10] 37 Am Jur, Municipal Corporations § 7 *et seq.*
[12, 13] 37 Am Jur, Municipal Corporations § 6.
[15] 16 Am Jur 2d, Constitutional Law § 8 *et seq.*
[20] 50 Am Jur, Statutes § 303 *et seq.*
[23, 34] 26 Am Jur 2d, Eminent Domain §§ 42, 120.
   Validity, construction, and effect of statutes providing for urban redevelopment by private enterprise. 44 ALR2d 1414.

5. TAXATION—CITIES—VILLAGES.
   Cities and villages may levy taxes only for public purposes
   (Const 1963, art 7, § 21).

6. CORPORATIONS—PUBLIC BODY—BORROWING.
   Borrowing and spending of a public body corporate, other than
   a city or a village, which has been validly and constitutionally
   created by the legislature, will be held to be valid whenever
   properly related to the corporate purposes.

7. BONDS—REVENUE BONDS—STATE OBLIGATIONS.
   Revenue bonds and self-liquidating bonds do not constitute obli-
   gations of the State of Michigan.

8. SAME—HOUSING AUTHORITY—STATE OBLIGATION.
   Bonds of the State housing development authority are not obli-
   gations of the State (PA 1966, No 346, § 25).

9. SAME—HOUSING AUTHORITY BONDS.
   Bonds of the State housing development authority authorized
   by the act creating it would be self-liquidating revenue bonds
   (Const 1963, art 9, § 15; PA 1966, No 346, §§ 25, 31, 32, 41).

10. CORPORATIONS—MUNICIPAL CORPORATIONS.
    The legislature is required to create both private and municipal
    corporations by general law (Const 1963, art 4, § 29).

11. SAME—HOUSING AUTHORITY—QUASI CORPORATION.
    The legislative intent of the State housing development authority
    act of 1966 was to create a *quasi* corporation rather than a
    corporation proper (PA 1966, No 346).

12. SAME—QUASI CORPORATIONS—LEGISLATURES.
    Legislatures have the authority to give corporate capacity to
    certain agencies in the administration of civil government and,
    in so doing, they create neither private corporations nor mu-
    nicipal corporations, but instead a class of artificial entities
    which have been designated *quasi* corporations.

13. SAME—QUASI CORPORATIONS—DEFINITION.
    *Quasi* corporations are bodies of citizens who have no personal
    or private interests to be subserved, but are simply required by
    the State to do some public work.

14. SAME—QUASI CORPORATIONS—HOUSING AUTHORITY—CONSTITU-
    TIONAL LAW.
    The State housing development authority as created is not an
    unconstitutional attempt to create a corporation by a special
    act, since it is merely a *quasi* corporation (Const 1963, art 4,
    § 29; PA 1966, No 346).

15. Constitutional Law—Government.
    Constitutional government concerns itself with means and not with ends.

16. States—Housing—Public Purpose.
    The encouragement of housing construction is a proper public purpose for the creation of a State agency.

17. Constitutional Law — Public Interest — Construction of Housing.
    The construction of housing is an enterprise affected with a public interest.

18. States—Construction of Housing.
    The creation of a State agency to take some measure to promote the construction of housing is a proper governmental function (PA 1966, No 346).

19. Same—Housing Act.
    The "State housing development authority act of 1966" is a general act and not a local or special act (Const 1963, art 4, § 29; PA 1966, No 346).

20. Courts—Legislative Declarations.
    Courts give great weight to legislative declarations of public purpose.

21. Health—Housing—Welfare—Safety.
    The relation between housing and health, welfare, and safety of the people of the State has been recognized in many legislative enactments and in legislative declarations of public policy.

22. Courts—Housing—Health.
    The erection of housing for persons of insufficient means has generally been upheld by the courts as a proper legislative action, being related to the improvement of the health, morals, and safety of the people.

23. Eminent Domain—Low-Cost Housing—Public Purpose.
    The taking of land by power of eminent domain and the erection on it of low-cost housing is taking for a public purpose.

24. States—Housing Authority—Funds.
    Funds of the State housing development authority are not State funds but are trust funds to be administered by the authority (PA 1966, No 346).

25. CONSTITUTIONAL LAW—HOUSING—PUBLIC WORK.

The construction of private housing is not a public work of internal improvement, the "State housing development authority act of 1966" does not make the State party to, financially interested in, or engaged in carrying on such work, and the act does not offend against the provision of the Constitution relating to the State's participation in works of internal improvement (Const 1963, art 3, § 6; PA 1966, No 346).

26. STATES—HOUSING AUTHORITY—APPROPRIATION—PUBLIC PURPOSE.

An appropriation to the State housing development authority for the purpose of administration of the act is a proper public purpose (PA 1966, No 346, § 57).

27. SAME—HOUSING FUND—PUBLIC PURPOSE.

An appropriation to the housing development fund or the capital reserve fund of the State housing development authority is not a public purpose (PA 1966, No 346).

28. CONSTITUTIONAL LAW—HOUSING FUND—APPROPRIATION.

An appropriation to the housing development fund or the capital reserve fund of the State housing development authority may be made upon the assent of 2/3 of the members elected and serving in each house of the legislature (Const 1963, art 4, § 30; PA 1966, No 346).

DISSENTING IN PART.

T. M. KAVANAGH and ADAMS, JJ.

29. CONSTITUTIONAL LAW—STATE CREDIT—HOUSING DEVELOPMENT AUTHORITY.

*Housing development authority act which empowers the authority to issue negotiable bonds and notes to carry out its purpose does not violate the constitutional provision which limits the State's power to grant its credit for any purpose, except as authorized by other provisions, since a public project supported by its own revenue is financially distinct from the State, since the bonds and notes issued to finance the project are payable from the special fund created for that purpose, and since the act recites that the State shall not be liable on the bonds and notes of the authority and that the bonds and notes shall not be a debt of the State (Const 1963, art 9, § 18; PA 1966, No 346).*

30. SAME—STATE BORROWING—HOUSING DEVELOPMENT AUTHORITY.

*Housing development authority act, which authorized the legislature to make appropriations to the authority which the au-*

*thority may use to pay principal and interest on authority bonds, is not in violation of the constitutional provision which requires approval of 2/3 of the members elected to each house of the legislature and of a majority of electors voting at any general election before the State may borrow, since the authority bonds are special obligation bonds, and the constitutional provision is limited in its application to general obligation bonds pledging the full faith and credit of the State (Const 1963, art 9, § 15; PA 1966, No 346).*

31. HEALTH—HOUSING DEVELOPMENT AUTHORITY—LOW-COST HOUSING.

*The health and general welfare of the people of the State are served under the housing development authority act which has as its objective the encouragement of an adequate supply of safe and sanitary dwelling accommodations within the financial means of low or moderate income families (PA 1966, No 346).*

32. CORPORATIONS — HOUSING DEVELOPMENT AUTHORITY — PUBLIC BOARDS AND COMMISSIONS.

*Housing development authority act did not create a quasi corporation, but did create a board or commission serving as an agency or instrumentality of the State, since the act placed the authority in the department of social services subject to budgetary control for housekeeping purposes by the department head (PA 1966, No 346).*

33. TAXATION — PUBLIC EXPENDITURES — PUBLIC PURPOSE — POLICE POWER.

*The public purpose of legislative appropriations raised by taxation is to be tested by the police power standards of public health, morals, safety, or the general welfare to determine if the appropriations are for a proper governmental purpose.*

34. SAME—PRIVATE PROPERTY—DUE PROCESS.

*One man's money or property can never be taken by taxation to be handed over to another for his private use or profit, since such scheme would be unconstitutional as a taking of private property without due process (Const 1963, art 1, § 17).*

35. HEALTH—HOUSING—PUBLIC INTEREST.

*The relation between housing and the health, welfare, and safety of the people of the State has caused the construction of housing to become an enterprise affected with a public interest.*

36. CONSTITUTIONAL LAW—HOUSING DEVELOPMENT AUTHORITY—AP-
PROPRIATIONS FOR PUBLIC PURPOSE.

*Any appropriation of funds by the legislature under the housing
development authority act to the authority which could be
used by the authority to finance private persons, corporations,
or other private legal entities in constructing and operating
low-cost housing requires a 2/3 vote of approval of the members
elected to each house of the legislature as provided by the
Constitution, since the appropriation of State funds would
be to carry out a private purpose even though an overriding
public purpose would be served (Const 1963, art 4, § 30; PA
1966, No 346).*

37. SAME—DUE PROCESS—HOUSING DEVELOPMENT AUTHORITY.

*Section of the housing development authority act providing for
a possible forgiveness of an advance made by the authority
to aid private operators in ascertaining if a project will qualify
for a government loan violates the constitutional provision pro-
hibiting deprivation of property without due process of law
(Const 1963, art 1, § 17; PA 1966, No 346, § 24).*

38. SAME—HOUSING DEVELOPMENT AUTHORITY—APPROPRIATIONS FOR
PRIVATE USE.

*Section of the housing development authority act which appro-
priates money from the general fund to the authority for the
administration of the act violates the Constitutional provision
requiring a 2/3 vote of approval of the members elected to
each house of the legislature, since the funds are not specifically
earmarked for administrative responsibilities, but could be used
to finance a private housing project (Const 1963, art 4, § 30; PA
1966, No 346, § 57).*

SEPARATE OPINION.

SOURIS, J.

39. CONSTITUTIONAL LAW—STATE BORROWING—HOUSING DEVELOP-
MENT AUTHORITY.

*Housing development authority act does not require the State
to borrow on its full faith and credit under provision which
allows the authority merely to recommend to the legislature
such borrowing, and thus does not violate the constitutional
restriction on State borrowing power which requires approval
of 2/3 of the members elected to each house of the legislature
and of a majority of the electors voting at any general election
before the State may borrow for specific purposes (Const 1963,
art 9, § 15; PA 1966, No 346).*

40. SAME—STATE CREDIT—HOUSING DEVELOPMENT AUTHORITY—PUB-
LIC HEALTH AND GENERAL WELFARE.

*Granting of the State's credit under housing development au-
thority act which appropriates public funds to stimulate the
construction of safe and sanitary dwelling accommodations
for low or moderate income families is not in itself a violation
of the constitutional provision which limits the State's power
to grant its credit for any purpose, except as authorized by
other provisions, since the Constitution also provides for the
passing of laws for the protection and promotion of the public
health and the legislative purpose in enacting the State housing
authority act was to promote and to protect the health and gen-
eral welfare of the people (Const 1963, art 4, § 51, art 9, § 18;
PA 1966, No 346).*

Request by Governor George Romney for ad-
visory opinion as to constitutionality of PA 1966,
No 346. Submitted January 11, 1967. (Calendar
No. 11, Docket No. 51,684.) Statute declared not
unconstitutional May 6, 1968.

*Amicus Curiae:* Urban Law Program by *Michael
G. Domonkos,* attorney, and *Patrick E. Kowaleski*
and *Michael C. Miran,* student staff assistants (GCR
1963, 921).

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, and *Maxine Boord
Virtue* and *Curtis G. Beck,* Assistant Attorneys
General, for the Attorney General.

BRENNAN, J. On January 4, 1967, this Court
received the following request for an advisory opin-
ion:

"Now comes George Romney, governor of the
State of Michigan, and invokes the jurisdiction of
this Court under the provisions of article 3, § 8,
Constitution of 1963. In support of this request
the governor shows unto the Court the following:

"1. That on October 28, 1966, Enrolled House Bill No 3898, having been duly enacted by the legislature, was signed by me into law and became PA 1966, No 346.

"2. That said Act No 346 was not given immediate effect by the legislature, is not presently effective, and will not become effective until March 10, 1967.

"3. That said Act No 346 has as its general purpose the providing of low cost housing, and the creation of a State housing development authority which is the vehicle for accomplishing this purpose. (Attached hereto for the information and convenience of the Court is a copy of Public Act No 346.) The act contemplates that the authority would borrow money and make loans to associations for the purpose of providing financing for the construction of low cost housing; that bonds issued by the authority would pledge for their payment the moneys received from the repayment of the loans to the authority by the associations; that a capital reserve fund is established which includes the borrowed money and State appropriations.

"4. That article 9, § 18 of the Constitution of 1963 prohibits the State from granting its credit to any person, association or corporation, public or private. Thus, a question arises as to whether Public Act 346 lends the credit of the State so as to violate the provisions of article 9, § 18 of the Constitution of 1963.

"6.[1] That Public Act 346 allows the legislature to appropriate funds to the capital reserve fund, which would be used to pay principal and interest on the bonds, and a question arises as to whether this is such a borrowing by the State which would require a two-thirds vote of the legislature and approval by the electors as provided in article 9, § 15, of the Constitution of 1963.

---

[1] As presented to the Court, the governor's request had no paragraph numbered 5.

"7. That the questions involved are of great state-wide importance and solemn concern to the people of the State of Michigan, and serious questions have arisen relative to the constitutionality of Public Act 346.

"Wherefore, and pursuant to the above-cited provisions of the Constitution of 1963, I, George Romney, governor of the State of Michigan, request the Supreme Court of this State to render its opinion as to the constitutionality of PA 1966, No 346.

"Respectfully submitted,
/s/ GEORGE ROMNEY
George Romney
Governor.

January 3, 1967."

## I. DESCRIPTION OF THE ACT.

PA 1966, No 346, was adopted by the legislature and approved by the governor on October 28, 1966. It is an act to create a State housing authority, to define the powers and duties of the authority, to establish a housing development revolving fund and a capital reserve fund, to authorize loans to qualified nonprofit sponsors and municipalities, to provide tax exemptions and to authorize payments in lieu of taxes by nonprofit housing corporations.

The act declares that there is a seriously inadequate supply of safe and sanitary dwelling accommodations within the financial means of low income or moderate income families. It declares that the construction of such housing is a valid public purpose and declares further that the authority and powers conferred by the act to be known as the "state housing development authority act of 1966" constitute a necessary program and serve a valid public purpose.

The act creates the State housing development authority which is declared to be a body politic

and corporate. It gives the authority general corporate powers, including the power to borrow and to loan money, to hold and convey real estate, to sue and be sued, and to do all other things necessary for the accomplishment of the purposes of the act.

## II. The Borrowing Power of the State of Michigan.

In considering the constitutionality of Act No 346, it is well at the outset to have in mind the limited power of the State of Michigan to borrow money. The State of Michigan is not authorized generally to borrow. Article 9, § 12, of the Constitution of 1963, says,

"No evidence of state indebtedness shall be issued except for debts authorized pursuant to this constitution."

The prohibition is clear and unequivocal. The State is without authority to borrow money except as constitutionally granted.

The Constitution of 1963 discloses only four specific instances in which the State is constitutionally permitted to borrow:

A. Short term borrowing to meet current appropriations.[2]

B. Long term borrowing adopted by two-thirds of the legislature, and approved by the electorate.[3]

C. For the making of loans to school districts.[4]

D. To retire Mackinac bridge bonds.[5]

The framers of the 1963 Constitution created a pay-as-you-go government for the State of Michigan. In furtherance of that scheme, the State of

---

[2] Const 1963, art 9, § 14.
[3] Const 1963, art 9, § 15.
[4] Const 1963, art 9, § 16.
[5] Const 1963, schedule and temporary provisions, § 14.

Michigan is specifically prohibited from becoming a guarantor or surety for anyone. It would be an obviously useless thing for the Constitution to prohibit the State from borrowing money and then permit the State to incur liabilities by becoming party to the borrowing of others. Thus, article 9, § 18, of the Constitution provides:

"The credit of the state shall not be granted to, nor in aid of any person, association or corporation, public or private, except as authorized in this constitution."

The purpose of this provision is to make certain that the State, which itself cannot borrow, except as authorized, does not accumulate unauthorized debts by indorsing or guaranteeing the obligations of others.

### III. THE BORROWING POWER OF STATE AUTHORITIES AND PUBLIC CORPORATIONS.

While the State of Michigan has no authority to borrow money except as specifically authorized in the Constitution, this is not true of public bodies corporate. Article 9, § 13, of the Constitution of 1963, provides:

"Public bodies corporate shall have power to borrow money and to issue their securities evidencing debt, subject to this constitution and law."

Public corporations, unlike the State, have general power to borrow money *except as prohibited* by the Constitution and by the statutes.

Nothing in section 13 refers to the purposes for which public bodies corporate may borrow money. Nor does the Constitution expressly limit the purposes for which public bodies corporate may spend money, which they obtain either by process of

borrowing or by gift, appropriation, or profit-making.

Article 7, § 21, of the Constitution of 1963, specifically provides that cities and villages may levy taxes only for public purposes. When attempting to assess the validity of borrowing by public corporations, other than cities and villages, however, no such constitutional guidelines are to be found. The validity of any borrowing by public corporations must be measured by the corporate purposes of the public body corporate itself, as contained in its charter or in the act of the legislature establishing the public body corporate. If a public body corporate has been validly and constitutionally created by the legislature, its borrowing and spending, insofar as any test of purpose is concerned, will be held to be valid whenever they are properly related to its corporate purposes.

This is not to say that the test of public purpose is irrelevant in this case. The existence of a public purpose is important here in three different respects, and will be dealt with later in this opinion.

## IV. BORROWING BY THE STATE HOUSING AUTHORITY.

Before passing to a discussion of public purpose, we must resolve the question of whether Act No 346 does in fact involve an unconstitutional grant of the credit of the State of Michigan to the authority contrary to article 9, § 18, of the 1963 Constitution.

As has been often held by our Court, revenue bonds and self-liquidating bonds do not constitute the obligations of the State of Michigan. A reading of Act No 346 indicates that great care has been taken in the drafting of the act to bring it within

this general scheme. Section 25, subd (3) of the act provides:

"Except as may otherwise be expressly provided by the authority, every issue of its notes or bonds shall be general obligations of the authority payable out of any revenues or moneys of the authority."

Section 31 of the act specifically provides:

"The state shall not be liable on notes or bonds of the authority and such notes and bonds shall not be a debt of the state. The notes and bonds shall contain on the face thereof a statement to such effect."

While section 32, subd (4) of the act provides that the authority shall certify to the governor the amount necessary to restore the capital reserve fund of the authority to an amount equal to the maximum amount of principal and interest maturing and becoming due in any succeeding calendar year on bonds then outstanding, the appropriations contemplated thereby are *permissive* only. The State does not assume any obligation to appropriate moneys necessary to pay the bonds.

Further, section 41 of the act provides that the authority from time to time at its discretion may recommend to the legislature an issuance of faith and credit bonds for a vote of the people. This section of the act conforms to section 15 of article 9 of the Constitution of 1963, and indicates a legislative intent that the full faith and credit of the State of Michigan will be used in assistance of the State housing development authority only when this constitutional provision[7] has been complied with.

---

[7] Const 1963, art 9, § 15:

"The state may borrow money for specific purposes in amounts as may be provided by acts of the legislature adopted by a vote of two-thirds of the members elected to and serving in each house, and ap-

The act does not obligate the State of Michigan, either directly or indirectly, to repay moneys borrowed by the State housing development authority. Its bonds would be self-liquidating revenue bonds within the meaning of that concept as it has been developed in our statutes and case law. No constitutional impediment to the authority exists on this basis.

## V. THE RELEVANCE OF PUBLIC PURPOSE.

To say that Act No 346 does not contain an unconstitutional grant of State credit, is not, however, to conclude that the act is without constitutional infirmities.

The power of the legislature to create corporate entities is carefully circumscribed by the Constitution. Article 15, § 1, of the Constitution of 1850, prohibited the legislature from creating corporations by special act, except for municipal purposes. The 1908 Constitution in article 12, § 1, repeated the prohibition but eliminated the words "except for municipal purposes." This language was excluded from the Constitution of 1963. However, article 4, § 29, of the 1963 document, reads as follows:

"The legislature shall pass no local or special act in any case where a general act can be made applicable, and whether a general act can be made applicable shall be a judicial question."[8]

---

proved by a majority of the electors voting thereon at any general election. The question submitted to the electors shall state the amount to be borrowed, the specific purpose to which the funds shall be devoted, and the method of repayment."

[8] The exclusion of the language of article 12, § 1, Constitution 1908, from the 1963 Constitution, was based upon the existence of article 5, § 30, Constitution 1908, which became article 4, § 29, Constitution 1963. See Official Record, Constitutional Convention of 1961, pp 598, 611, Exclusion Report 2006.

Considering the fact that since the Constitution of 1908 the legislature has been required to create both private and municipal corporations by general law, it is obvious that general laws can be made applicable to accomplish this purpose. A closer scrutiny of the act, however, leads to the conclusion that it was not the intention of the legislature to create a corporation in the ordinary sense. Section 21, subd (4) of the act provides as follows:

"The authority shall be within the department of social services and shall exercise its prescribed statutory powers, duties and functions independently of the head of the department, except that all budgeting, procurement and related functions of the authority shall be performed under the direction and supervision of the head of the department of social services."

Thus it would appear that the legislative intent was to create a *quasi* corporation rather than a corporation proper. The Constitution of 1963 does not address itself to the establishment of *quasi* corporations, but it has long been accepted that legislatures have the authority to give corporate capacity to certain agencies in the administration of civil government. And in so doing, they create neither private corporations nor municipal corporations, but instead a class of artificial entities which have been designated *quasi* corporations. As was stated in *Huron-Clinton Metropolitan Authority* v. *Boards of Supervisors of Five Counties* (1942), 300 Mich 1, on page 20:

"It was not intended, as we view the constitutional provision, to strip the legislature of the power to create specific and supplemental governmental agencies designed to function in a limited sphere in the accomplishment of public purposes for which existing municipal corporations either singly or in

designated groups were not suited. Such agencies do not arise to the dignity of municipal corporations. They are lacking in very many of the powers which are commonly and necessarily characteristic of such corporations. They more closely resemble boards or commissions."

The *Huron-Clinton Case,* above cited, quotes from *Beach* v. *Leahy* (1873), 11 Kan 23, as follows:

"The mere fact that these organizations are declared in the statute to be bodies corporate, has little weight. We look behind the name to the thing named. Its character, its relations, and its functions determine its position, and not the mere title under which it passes. In the last five cases cited the organizations were declared in the statute creating them to be bodies corporate, yet this made no difference in the rule. The conclusion to which these investigations has led us is, that among public corporations only corporations proper are included within the scope of article 12 of the State Constitution, and that a school district is only a *quasi* corporation, and not covered by its provisions."

Further citations in the *Huron-Clinton Case* give us other criteria by which to determine whether the legislature has made an unconstitutional attempt to create a corporation by local or special act, or whether it has validly exercised its power to confer corporate powers upon an agency of State government, thus creating what is known as a *quasi* corporation.

Such *quasi* corporations are described as bodies of citizens who have no *personal nor private interests* to be subserved, but are simply required by the State to do some *public work.* It is said that the reason for the constitutional restriction does not exist, where the State merely clothes one of its own agencies or instrumentalities with such corporate

power. It is said that the conferring of corporate powers by the legislature upon agencies of the State, appointed to perform some *public work,* in the course of the administration of civil government, the more efficiently to perform the duties imposed, is not such an act as is prohibited by the Constitution.

The *Huron-Clinton Case* distinguishes *Farrell* v. *Port of Columbia* (1907), 50 Or 169 (91 P 546, 93 P 254), on the ground that the corporation therein involved, which was created by special act, was designed and authorized to function in the field of private enterprise, doing business commonly done by transportation companies. The Court said it was not merely a governmental agency.

In *City of Ecorse* v. *Peoples Community Hospital Authority* (1953), 336 Mich 490, at page 502, the Court says:

"We have here a matter of health, which is a question of statewide concern and in which the legislature has a large area of discretion. The defendant authority is a State agency and, as such, is not a municipal corporation or a body created by the municipalities here involved but by the State itself. See *Huron-Clinton Case, supra.* The legislation in question, not being local in nature, does not require the vote of the local electors for its approval under article 5, § 30, Constitution 1908."

Thus it would appear that the State housing development authority as created by Act No 346 is not an unconstitutional attempt to create a corporation by a special act, if in fact, it is merely a *quasi* corporation, that is the clothing of an agency or instrumentality of State government with corporate powers to perform some public work in the course of the administration of civil government. The act is largely ambiguous on this subject. On

the one hand, it calls the authority a public body corporate and politic, and on the other hand, it says the authority shall be within the department of social services.

We must, as has been stated, look behind the name to the thing named. We must examine its character, its relations, and its functions to determine, indeed, whether it is an agency or instrumentality of State government. This examination leads us to a consideration of the purposes sought to be accomplished by the law. If those purposes are public purposes, if the work of the entity is a public work, then the State housing development authority is a State agency or instrumentality and its creation is a constitutional exercise of legislative power.

If those purposes are not public purposes, or the work of the entity not a public work, then Act No 346 is an unconstitutional attempt to create a body corporate by special act without a two-thirds majority in the legislature and the approval of the electorate.[9]

If those purposes are not public purposes, there may be further constitutional infirmities.

Article 3, § 6, Constitution 1963, provides:

"The state shall not be a party to, nor be financially interested in, any work of internal improvement, nor engage in carrying on any such work, except for public internal improvements provided by law."

Article 4, § 30, Constitution 1963, provides:

"The assent of two-thirds of the members elected to and serving in each house of the legislature shall be required for the appropriation of public money or property for local or private purposes."[10]

_____

9 Const 1963, art 4, § 29.
10 The journals of the legislature indicate that Act No 346 did not carry a two-thirds majority in the House of Representatives.

The public purpose issue then, has three faces.

*First,* as it relates to the question of whether the State housing development authority is a State agency, a mere *quasi* corporation, and not a corporation proper.

*Second,* as it relates to the authority of the State to engage in a work of internal improvement.

*Third,* as it relates to the constitutionality of an appropriation to the use of the authority by less than two thirds of the legislature.[11]

In this discussion of public purpose, it is good to bear in mind that constitutional government concerns itself with means and not with ends. Thus, it is often the case that when courts indulge in a discussion of whether or not a specific piece of legislation exhibits a valid public purpose, they are actually attempting to decide whether the means which the legislation proposes to employ are valid and proper to accomplish an admittedly public purpose. In a footnote to the majority opinion in *City of Gaylord* v. *Gaylord City Clerk* (1966), 378 Mich 273, there appears a quotation from Justice COOLEY in *People, ex rel. Detroit & H. R. Co.,* v. *Township Board of Salem* (1870), 20 Mich 452, in which Justice COOLEY makes it clear that what is a public purpose for the valid exercise of regulations under the police power may not be a public purpose for the exercise of the power of eminent domain and, further, that the expenditure of public funds may not be regarded as being made for a public purpose where some other exercise of governmental authority might be valid to accomplish the same end.

Putting it very simply, we have building codes which are a valid exercise of the police power to insure that our people will live in safe and sanitary

---

[11] The act contemplates future appropriation, and also contains an initial appropriation of $5,000. PA 1966, No 346, § 57.

dwellings.   We are accustomed to say that such codes accomplish a valid public purpose.   But an act appropriating hundreds of millions of public dollars to completely rewire or fireproof every building in the State is quite a different thing than electrical building code or a set of fireproofing regulations.   Such enactments would not be literally distinguishable on the basis of the purpose they are intended to accomplish.   Both are aimed at the same public purpose, to wit, the safety of our people. The enactments would be distinguishable only on the basis of the means employed.   Direct expenditures would probably be struck down as unconstitutional while regulatory measures would be upheld as constitutional.   And in both cases, the Court, if precedent were to be followed, would engage in a discussion of whether or not the specific enactment was directed to a proper public purpose.   In the discussion that follows then, the question of public purpose will be treated separately as it relates to the three means which are at issue here, (1) creation of a State agency, (2) construction of internal improvement, (3) expenditure of public funds.

VI. PUBLIC PURPOSE AS IT RELATES TO THE
STATUS OF THE STATE HOUSING
DEVELOPMENT AUTHORITY
AS A QUASI-CORPORATE
STATE AGENCY.

Setting aside for the moment the involvement of the State housing development authority in the actual construction of dwellings, there can be no doubt that it is a proper public purpose for the State to concern itself with the housing of its inhabitants.

The following powers are granted to the authority:

"Sec. 22. The authority shall have all the powers necessary or convenient to carry out and effectuate the purposes and provisions of this act, including the following powers in addition to all other powers granted by other provisions of this act: * * *

"(b) To undertake and carry out studies and analyses of housing needs within the state and ways of meeting such needs, including data with respect to population and family groups and the distribution thereof according to income groups, the amount and quality of available housing and its distribution according to rentals and sale prices, employment, wages and other factors affecting housing needs and the meeting thereof; and to make the results of such studies and analyses available to the public and the housing and supply industries; and to engage in research and disseminate information on housing. * * *

"(d) To survey and investigate the housing conditions and needs, both urban and rural, throughout the state and make recommendations to the governor and the legislature as to legislation and other measures necessary or advisable to alleviate any existing housing shortage in the state. * * *

"(f) To encourage community organizations to assist in initiating housing projects for low income or moderate income persons as provided in this act.

"(g) To encourage research in, and demonstration projects to develop, new and better techniques and methods for increasing the supply of housing for low income or moderate income persons."

It is clearly a public purpose and a proper governmental function to encourage the private sector of the economy to build houses. It is equally proper for the State to assist private enterprise to this goal by research, study, and the dissemination of information.

The location of our State in the north temperate zone makes it evident that human life cannot sub-

sist in Michigan without man-made shelter.  The condition of our present urbanization and industrialization makes it practically impossible for the vast majority of our citizens to construct their own dwelling houses.  Modern technology, the logistics of moving building supplies, the intricacy of plumbing, electrical, and other building codes, and the need for economy in land use, all conspire to move the construction of single and multiple dwellings further from the competence of the average householder.

The construction of housing has become in our times an enterprise affected with a public interest.

By the most ancient principles of *jus publicum* the creation of a State agency in our day to take *some* measures to promote the construction of housing is a proper governmental function.  The grant of corporate powers to such an agency make it a *quasi* corporation only.  It remains an instrumentality of the State.  Its members are engaged in a public work.  For this reason, Act No 346 is a general act and not a local or special act within the meaning of Const 1963, art 4, § 29.

### VII.  PUBLIC PURPOSE AS IT RELATES TO THE CONSTITUTIONAL LIMITATION UPON THE CONSTRUCTION OF INTERNAL IMPROVEMENTS.

Setting aside for a moment the use of funds appropriated or to be appropriated by the legislature, does Act No 346 violate article 3, § 6, Constitution 1963?[12]

---

[12] Const 1963, art 3, § 6:

"The state shall not be a party to, nor be financially interested in, any work of internal improvement, nor engage in carrying on any such work, except for public internal improvements provided by law."

First, is the construction of housing for persons of low or moderate income a "public internal improvement?"

Section 1 of Act No 346 provides as follows:

"It is hereby determined that there exists in the state of Michigan a seriously inadequate supply of safe and sanitary dwelling accommodations within the financial means of low income or moderate income families. It is further determined that to undertake the clearance of slums and blighted areas, and at the same time meet the urgent needs of the residents of these areas, *it is a valid public purpose to construct such housing for low income or moderate income persons who are displaced by such programs,* and who would otherwise be unable to obtain adequate dwelling accommodations which they could afford." (Emphasis supplied.)

Courts give great weight to legislative declarations of public purpose. In this case, there is a gap between the legislative declaration and the provisions of the act. While section 1 declares that it is a public purpose to construct housing for low income persons or moderate income persons who *are* displaced by slum clearance, it makes no such declaration with respect to low income or moderate income persons who are *not* so displaced.

Section 11, subd (g) of the act provides, among other things:

"Among low income or moderate income persons, *preference* shall be given to those displaced by urban renewal, slum clearance or other governmental action in accordance with regulations and procedures applicable to housing projects assisted with federally-aided mortgages." (Emphasis supplied.)

Section 45 of the act likewise provides:

"Among low income or moderate income persons, *preference* shall be given to those displaced by urban renewal, slum clearance or other governmental action." (Emphasis supplied.)

Thus, even if the legislative declaration were conclusive, it is not broad enough to encompass the functions to be carried out under the act.

We must, therefore, test the question of whether the construction of housing for low and moderate income persons, as envisioned in the act, is a public internal improvement without reference to the declaration quoted.

The relation between housing and health, welfare, and safety of the people of the State has been recognized in many legislative enactments and in legislative declarations of public policy. Typical of these, is the declaration contained in PA 1941, No 250, § 2, being CL 1948, § 125.902 (Stat Ann 1958 Rev § 5.3058[2]), as follows:

"It is hereby declared that in the cities of the state substandard and insanitary areas exist which have resulted from inadequate planning, excessive land coverage, lack of proper light, air, and open space, defective design and arrangement of buildings, lack of proper sanitary facilities, and the existence of buildings, which, by reason of age, obsolescence, inadequate or outmoded design, or physical deterioration, have become economic or social liabilities, or both; that such conditions are prevalent in areas where substandard, insanitary, outworn or outmoded industrial, commercial or residential buildings prevail, and are conducive to ill health, transmission of disease, infant mortality, juvenile delinquency, crime and poverty; that such conditions impair the economic value of large areas, infecting them with economic light [blight?]."

The erection of housing for persons of insufficient means has generally been upheld by the courts as a proper legislative action, being related to the improvement of the health, morals, and safety of the people. The taking of some areas by power of eminent domain and the erection thereon of low-cost housing has been held to be a public purpose.[18] It is abundantly clear that the rationale of the *Brewster Street* decision, and others like it, is that there is a logical relationship between housing and disease, between housing and crime, between housing and immorality, and between housing and poverty. The erection of low-cost housing may also serve the same public purpose long recognized in direct welfare programs in the construction and maintenance of poorhouses, and in a multitude of State legislative acts by which the corporate conscience of the community in such matters is expressed.

But Act No 346 is not such a welfare measure. There is no test of need, in the sense that the construction of the housing contemplated by the act is the *sine qua non* of adequate shelter for the persons the act seeks to benefit.

Act No 346 provides for mortgage loans to be made by the State housing development authority to qualified nonprofit housing corporations and consumer housing cooperatives. Section 11, subd (k) describes a qualified nonprofit housing corporation as one incorporated pursuant to the provisions of the Michigan general corporation act and the provisions of Act No 346. It requires that such nonprofit housing corporation be organized exclusively to provide housing facilities for persons of low and moderate income. Section 11, subd (*l*) of the act defines a consumer housing cooperative

---

[18] *In re Brewster Street Housing Site* (1939), 291 Mich 313.

as a nonprofit corporation organized under the laws of the State for the purpose of providing dwelling accommodations for its members which would be qualified, under Federal regulations, for Federally-aided financing.

In section 11, subd (g) of the act, low income or moderate income persons are defined as follows:

"Families and persons who cannot afford to pay the amounts at which private enterprise, without federally-aided mortgages or state-aided loans, is providing a substantial supply of decent, safe and sanitary housing. The income limits applicable for the admission of such families and persons to housing projects financed with federally-aided mortgages shall be those established pursuant to the rules applicable to such housing projects assisted with such federally-aided mortgages."

A Federally-aided mortgage is defined in section 11, subd (c) of the act as being a below-market-interest-rate mortgage insured or purchased by the secretary of the department of housing and urban development, or a market-interest-rate mortgage insured by the secretary and augmented by a program of rent supplements authorized by the housing and urban development act of 1965.

A reading of Act No 346, with its many references to Federal rules and regulations and adaptation to Federal standards, makes it abundantly clear that one of the purposes of the legislature in enacting this law was to take advantage of Federal funds made available under the housing and urban development act of 1965 and other Federal regulations and appropriations. Ever since the case of *Massachusetts* v. *Mellon* (1923), 262 US 447 (43 S Ct 597, 67 L ed 1078), it has been generally accepted that Federal government spending is limited only by the bounds of congressional largess. Certainly,

the Federal government is not prohibited from undertaking nonpublic works of internal improvement as is the State of Michigan.

Under 5 USC § 624(c), being Public Law 89-174, § 5a, the powers and duties of the Federal housing administration have been transferred to the secretary of housing and urban development. Section 4a of the same act provides that there shall be an assistant secretary in that department who shall be called the Federal housing commissioner, who shall head a Federal housing administration within the department.

The definition of Federally-aided mortgage, which appears in section 11, subd (c) of Act No 346, relates to the mortgages purchased or insured by the secretary of the department of housing and urban development, which are below-market-interest-rate mortgages. These below-market-interest-rate mortgages are authorized by section 221(d)(5) of the national housing act, which provides certain types of mortgages to carry an interest rate of 3% with an increment based upon current interest rates required on certain bonds of the Federal government.

Such below-market-interest-rate mortgages are stated in that section of the national housing act to be permitted to mortgagors who are defined or described in section 221(d)(3) of the national housing act, being 12 USC, § 1715(l)(d)(3). Mortgagors permitted to receive these low interest rate mortgages are defined as public bodies or agencies, cooperatives, limited dividend corporations, and nonprofit corporations, who are regulated as to rents, charges and methods of operation, either by local agencies or units of government or by contract with the housing commissioner. The only standard mentioned in the act as to who can occupy the housing built by these corporations or agencies is

as follows: *"low and moderate income families or displaced families shall be eligible for occupancy."*

The type of housing to be built under this section and by these mortgagors is generally multiple residence units. Under various conditions they are to be permitted to cost between $8,000 per unit and $32,987.50 per unit.

The second type of Federally-aided mortgage referred to in section 11, subd (c) of Act No 346 is a market-interest-rate mortgage insured by the secretary and augmented by a program of rent supplements authorized by the housing and urban development act of 1965. That act authorizes the payment of rent supplements to owners of multiple dwelling units on behalf of qualified tenants. The qualified tenants are described therein (79 Stat 451, Public Law 89–117, being the housing and urban development act of 1965), as those who have an income below the maximum which can be established under section 2(2) and section 15(7)(b)(ii) of the United States housing act of 1937, and in addition to that income qualification are persons who are displaced by government action or 62 years of age or over, are physically handicapped, are occupying substandard housing or are living in a damaged home in a disaster area as defined by the small business administration.

This reference to an income limit contained in the housing and urban development act of 1965 refers to the housing act of 1937, and is contained in 50 Stat 888, 42 USC, § 1402(2). The description is as follows: *"families who are in the lowest income group and who cannot afford to pay enough to cause private enterprise in their locality or metropolitan area to build an adequate supply of decent, safe, and sanitary dwellings for their use."* The other reference, section 15(7)(b)(ii), United States housing act of 1937, defines low income persons as *those*

*whose ability to pay rent represents a 20% gap between the highest public housing rentals and the lowest private housing rentals available in the area.* 42 USC § 1415(7)(b)(ii).

Neither Act No 346 nor the Federal statutes referred to in the act contain any limitation upon the holdings which an eligible person may have. Thus a person may own a dwelling house free and clear, he may in fact own several houses and derive rental income therefrom, and still be eligible for occupancy of one of the units constructed under this program.

In point of fact, the construction program envisioned by the statutes under consideration are not primarily designed to assist certain people, *per se.* The major thrust of the legislation is to fill a gap in the housing market. The definitions of eligibility are essential only as descriptive of the kinds of housing the acts seek to encourage. The conclusion is inescapable that the construction of housing envisioned in the act is not a work of public internal improvement.

The construction to be encouraged by the act is, however, a work of internal improvement, and it is therefore necessary to decide whether the State will be a party to it, financially interested in it, or engaged in carrying on such work, as prohibited by article 3, § 6, Constitution 1963.

The act does not authorize the State housing development authority to build buildings. It does not anticipate that the State housing development authority will be party to building contracts. It cannot be said then that the State agency will be a party to, nor engaged in, carrying on the construction of housing. The State housing development authority will, however, be making advances and mortgages for the purpose of financing such construction.

Section 23 provides:

"(1) There is created and established under the jurisdiction and control of the authority a revolving fund to be known as the 'housing development fund'.

"(2) There shall be paid into the housing development fund (a) any moneys appropriated and made available by the state for the purposes of the fund; (b) any moneys which the authority receives in repayment of advances made from the fund, and (c) any other moneys which may be made available to the authority for the purpose of the fund from any other source or sources."

Section 39, subd (1) provides, in part:

"(1) All moneys of the authority, except as otherwise authorized or provided in this section, shall be paid to the state treasurer as agent of the authority, who shall not commingle such moneys with any other moneys.   Such moneys shall be deposited in a separate bank account or accounts."

Moneys of the State housing development authority are not moneys of the State. The funds to be established under the act are trust funds to be administered by the State housing development authority. The State has no beneficial interest in such funds, and when such funds are used to finance the construction of housing, the State cannot be said to be financially interested in such construction. The State government can neither gain nor lose by reason of such construction. We conclude, therefore, that while the construction of private housing is not a public work of internal improvement, the act does not make the State party to, financially interested in, or engaged in carrying on such work, and the act does not therefore offend against Constitution 1963, art 3, § 6.

VIII. Public Purpose as it Relates to the
      Appropriation of Public Funds.

The final light in which the notion of public pur-
pose must be viewed has to do with the appropria-
tion of public funds to the State housing develop-
ment authority. As has been already seen, Act No
346 is itself an appropriation bill, by reason of the
provisions of section 57 providing $5,000 for the
initial administration of the law. Since the creation
of the State housing development authority as an
agency of State government is a constitutional
means to serve a proper public purpose (see sub-
division VII of this opinion), an appropriation to
be used purely for the *administration* of the author-
ity is an appropriation for a public purpose.

But the act contemplates appropriations to the
housing development fund, and to the capital re-
serve sinking fund as well. The housing develop-
ment fund will be used to make loans and advances
to private corporations. The capital reserve sink-
ing fund will be used to repay bonds issued for the
same purpose. Appropriations to these funds do
not constitute appropriations for public purposes.[14]

This does not mean, however, that the State can,
under no circumstances, appropriate public money
to such funds. Constitution 1963, art 4, § 30, pro-
vides:

"The assent of two-thirds of the members elected
to and serving in each house of the legislature shall
be required for the appropriation of public money
or property for local or private purposes."

This provision of the Constitution recognizes that
the doctrine of public purpose is not an exact meas-
uring rod for the appropriation of public moneys.

---

[14] *Opinion of the Justices to the House of Representatives* (1935),
291 Mass 567 (195 NE 897).

What it says to us in effect is, that when the legislature speaks through a majority of two-thirds, it is not the function of the Court to measure the expenditure against traditional notions of public purpose. That the delegates to the Constitutional Convention have chosen to express the concept in terms of authorizing the use of public money for "private" purposes, is not fatal. The Constitution merely acknowledges that the legislature speaks for the public, and in a very broad sense its sights are always leveled upon public concerns and its purposes are always to advance the public interest.

To be sure the procedural safeguard of a two-thirds majority makes the undertaking of novel projects of public welfare more difficult. But at the same time, the provision opens wide the vistas of governmental action whenever general agreement upon the need exists.

## Summary.

1. P.A. 1966, No 346, is not unconstitutional.

2. The bonds of the State housing development authority are not obligations of the State.

3. The encouragement of housing construction is a proper public purpose for the creation of a State agency.

4. The State may not directly engage in the financing or construction of private housing.

5. The funds of the State housing development authority are not State funds.

6. An appropriation to the State housing development authority for the purpose of administration is a proper public purpose.

7. An appropriation to the housing development fund, or the capital reserve fund of the State housing development authority is not a proper public purpose.

8. An appropriation to the housing development fund or the capital reserve fund of the State housing development authority may be made upon the assent of two-thirds of the members elected to and serving in each house of the legislature.

DETHMERS, C. J., and KELLY, BLACK, and O'HARA, JJ., concurred with BRENNAN, J.

ADAMS, J. (*dissenting in part*). The governor's request for an advisory opinion submits two basic questions:

1. Does PA 1966, No 346, violate the provisions of Const 1963, art 9, § 18, which prohibits the State from granting its credit to or in aid of any person, association, or corporation, public or private, except as authorized in the Constitution?

2. If appropriations are made by the legislature to the funds of the authority, as authorized by the act, and such appropriations are used to pay principal and interest on bonds of the authority, is such action a borrowing by the State within the meaning of Const 1963, art 9, § 15?

I agree with the conclusion of Justice BRENNAN that PA 1966, No 346, does not violate the provisions of Const 1963, art 9, § 18. This Court has repeatedly held that a public project supported by its own revenue is financially distinct from government itself—at least to the extent that the project does not involve the credit of the government, because the bonds issued to finance the project are payable from the special fund created for that purpose to which the revenues of the project are deposited. Any financing undertaken by the housing development authority payable from its revenues would be within the concept of the special fund doctrine. Since Act No 346, § 31, recites that the

State shall not be liable on the notes or bonds of the authority and that such notes and bonds shall not be a debt of the State, "There has been no pledge of State credit as security for the bonds, and, therefore, there has been no granting of the credit of the State." *State Highway Commissioner* v. *Detroit City Controller* (1951), 331 Mich 337, 356, 357.

I would answer the second question on the authority of *Schureman* v. *State Highway Commission* (1966), 377 Mich 609, where it is said (p 612):

"We hold article 9, § 15, does. not apply to the special obligation bonds here involved. We hold that the quoted article is limited in its application to general obligation bonds pledging the full faith and credit of the State."

I agree that the public health and general welfare of the people of the State are served by the authority which has as its objective the encouragement of an adequate supply of safe and sanitary dwelling accommodations within the financial means of low-income or moderate-income families. That such a law has a public purpose is fully demonstrated by the cases collected and cited in my opinion in *City of Gaylord* v. *Gaylord City Clerk* (1966), 378 Mich 273.

Absent specifically indicated legislative intent so to do, I do not read Act No 346 as creating a *quasi* corporation. The legislature did not create a body —the authority—having clearly defined characteristics. It placed the authority in the department of social services in State government, subject to budgetary control for housekeeping purposes by the department head. Somewhat inconsistently, the legislature named it a public body corporate and politic, but it said the powers of the authority shall be vested in the members thereof in office from time

to time.  The authority is nothing more than a board or commission serving as an agency or instrumentality of the State.*

I agree with Justice Brennan that the authority is not authorized to engage in works of internal improvement.  See *City of Gaylord* v. *Gaylord City Clerk, supra,* p 289.

As Justice Brennan states, the act contemplates appropriations to the housing development fund and to the capital reserve fund.  The housing de-

---

* For the creation by the legislature of other boards or commissions see:

(1) Community airport authority: PA 1957, No 206, CLS 1961, § 259.621 *et seq.* (Stat Ann 1960 Rev § 10.311 *et seq.*), "a body corporate".

(2) Michigan State apple commission: PA 1939, No 87, CL 1948, § 290.51 *et seq.* (Stat Ann 1967 Rev § 12.1220[1] *et seq.*), "a corporate body", "it shall have and possess all the powers of a corporation".

(3) Mackinac bridge authority: PA 1950 (Ex Sess), No 21, CLS 1961, § 254.301 *et seq.* (Stat Ann 1958 Rev § 9.1360[1] *et seq.*), "hereby created a nonsalaried entity as a public benefit corporation and an agency and instrumentality of the state of Michigan to be known as the Mackinac bridge authority, which is hereby made a body corporate".

(4) Charter water authority: PA 1957, No 4, CLS 1961, § 121.1 *et seq.* (Stat Ann 1958 Rev § 5.2533[31] *et seq.*), "shall be a public municipal corporation".

(5) Michigan cherry commission: PA 1947, No 228, CL 1948, § 290.501 *et seq.* (Stat Ann 1967 Rev § 12.95[1] *et seq.*), "a body corporate".

(6) Huron-Clinton metropolitan authority: PA 1939, No 147, CL 1948, § 119.51 *et seq.* (Stat Ann 1958 Rev § 5.2148[1] *et seq.*), "to form a metropolitan district as a body corporate".

(7) Community hospital authority: PA 1945, No 47, CL 1948, § 331.1 *et seq.* (Stat Ann 1958 Rev § 5.2456[1] *et seq.*), "shall be a body corporate".

(8) Economic development act: PA 1947, No 302, CL 1948, § 125.1 *et seq.* (Stat Ann 1961 Rev § 3.540[1] *et seq.*), "hereby created a department of the state government to be known as the department of economic development".

(9) Michigan hospital survey and construction act: PA 1947, No 299, CL 1948, § 331.501 *et seq.* (Stat Ann 1956 Rev § 14.1201 *et seq.*), "There is hereby established in the executive branch of the state government an office of hospital survey and construction".

(10) Michigan turnpike authority: PA 1953, No 176, CLS 1961, § 252.101 *et seq.* (Stat Ann 1958 Rev § 9.1095[1] *et seq.*), "There is hereby created as a public benefit corporation an agency and instrumentality of the state of Michigan to be known as the Michigan turnpike authority".

velopment fund will be used to make loans and advances to private corporations and the capital reserve fund will be used to repay bonds issued for the same and other purposes. He concludes that appropriations to these funds do not constitute appropriations for public purposes but that under Const 1963, art 4, § 30, the assent of 2/3 of the members elected to and serving in each house of the legislature permits the appropriation of public money or property for local or private purposes.

I disagree with Justice BRENNAN as to the significance of public purpose as it relates to legislative appropriations. Public purpose, so applied, is to be tested by the police power standards of public health, morals, safety, or the general welfare to determine if the authorized appropriation and expenditure of the public revenues raised by taxation are for a proper governmental purpose within the legitimate exercise of legislative power. If not, the appropriation may amount to an unconstitutional taking of private property without due process of law. One man's money or property can never be taken by taxation to be handed over to another for his private use or profit. Any such scheme would be unconstitutional as a taking of private property without due process. *People, ex rel. Detroit & H. R. Co.,* v. *Salem Township Board* (1870), 20 Mich 452. The explanation of the *Salem Case* is given by Justice COOLEY himself in the later case of *People, ex rel. Trombley,* v. *Auditor General* (1871), 23 Mich 471, 483, where he said:

"This Court held, in *People, ex rel. Detroit & H. R. Co.,* v. *Salem Township Board* (1870), 20 Mich 452, 454, that a legislative act originating proceedings by, or in pursuance of, which individual property was to be taken under the forms of taxation for the benefit of a private corporation, could not

be justified as an exercise of legislative power. It was not, therefore, due process of law."

Article 4, § 30, traces its origin in Michigan to Const 1850. It apparently was borrowed by the drafters of that Constitution from a State of New York Constitution. The section deals with appropriation bills and relates to the legislative vote requisite to passage of such a bill appropriating public money or property for local or private purposes. · I do not construe Const 1963, art 4, § 30, as furnishing a cure-all for constitutional infirmities, provided legislative assent to the appropriation can be obtained by a 2/3 vote. It was never intended to eliminate an essential ingredient in the exercise of the power of taxation—that the taking of an individual's money or property by taxation may only be done lawfully in the exercise of a public purpose.

Article 4, § 30, of the present Constitution, like its predecessors, must be construed as requiring that the appropriation of public money or property be in furtherance of the public interest or public good although the beneficiary of the appropriation may be private enterprise or individuals in their private capacities, or the appropriation may be one which is for a local purpose. To sustain such an appropriation, even though passed with the necessary 2/3 vote in the legislature, it is essential to find as an overriding condition of the appropriation that it is in furtherance of the general welfare of the people of the State or in furtherance of the public health or safety, or some other similar beneficial public interest. I agree with Justice Brennan as to the relationship between housing and the health, welfare, and the safety of the people of the State of Michigan, as stated by him in section 6 of his opinion: "The construction of housing has

become in our times an enterprise affected with a public interest."

I also agree with Justice Brennan that the primary purpose of the act is to meet the housing needs of low-income persons or moderate-income persons who are displaced by slum clearance. I do not agree with Justice Brennan that the failure of Act No 346 to restrict its operation to such persons enlarges the proposed operation of the act to such an extent as to bring it under Const 1963, art 4, § 30, and require a 2/3 vote of the legislature in connection with an appropriation to the housing development fund or the capital reserve fund. In my opinion, any appropriation by the legislature of funds which could be used by the housing authority to finance *private* persons, corporations, or other *private* legal entities to construct and operate low-cost housing, even though the beneficiaries of such low-cost housing were restricted to those persons to whom the act now gives a preference, would still require a 2/3 vote because such an appropriation of State funds would be to carry out a private purpose or enterprise even though an overriding public purpose would be served. Since the act's overriding purpose is a public one, I find no infirmity in the act because, as a very minor incident, some persons of means might benefit from the act's ultimate objective of providing low-cost housing to displaced low- or moderate-income groups.

Section 24 of the act provides for a possible forgiveness of an advance made by the authority to aid private operators to ascertain if a project will qualify for a governmental loan. Such an advance of public money by the authority would, upon the happening of certain conditions subsequent, become a gift. It would be an advance of public money to permit an individual corporation or association to submit a request for government financing on a

housing development still in the planning stages and amounts to saying, "Go ahead, see if you can get a government loan." If the answer is "No", the advance from the public funds need not be repaid. While the general welfare of the people of the State would be served by advancing State money to help the developer to make his inquiry, the forgiveness of such indebtedness would violate due process. Consequently, in my opinion, section 24 of the act is unconstitutional.

I do not agree with Justice Brennan that the last section of the act, namely, section 57, appropriating $5,000 from the general fund for the administration of the act, is to be used purely for administration of the authority and is, therefore, an appropriation for a public purpose which does not require 2/3 vote of the legislature.

The appropriation is for the *administration of the act*. It is not earmarked to carry out the housing authority's administrative responsibilities but, conceivably, could be used to finance a private housing project. Such an appropriation, unlike one line-itemed to carry out the housing authority's responsibilities as a public agency to aid, assist, advise, and counsel the housing industry in the development of low-cost housing, would require 2/3 vote of the legislature.

It is my opinion that, except for sections 24 and 57, the State housing development authority act of 1966 (PA 1966, No 346) is constitutional legislation.

T. M. Kavanagh, J., concurred with Adams, J.

Souris, J. I cannot subscribe my Brethren's opinions. They go far beyond the two specific constitutional questions asked in the governor's request

for our advisory opinion[1] and answered in the briefs filed by the attorney general, at this Court's request, and by the urban law program of the University of Detroit school of law, as *amicus curiae.* The governor asked, specifically, whether PA 1966, No 346[2] violates Const 1963, art 9, §§ 15, 18. In my opinion it violates neither of those provisions, but I refrain from expressing any opinion on other constitutional issues considered by my Brethren or still lying dormant in the act.

## I.

*Schureman* v. *State Highway Commission* (1966), 377 Mich 609, compels my agreement that Act No 346 does not violate art 9, § 15. There we held that only general obligation bonds pledging the full faith and credit of the State, as distinguished from special obligation bonds and revenue bonds, are subject to the limitations upon the State's borrowing power imposed by art 9, § 15.[3] Act No 346 does not require the State to borrow on its full faith and credit although section 41 does provide that the State housing development authority may recommend such borrowing to the legislature for a vote of the people as required by art 9, § 15.

## II.

Article 9, § 18 is a limitation upon the State's power to grant its credit for any purpose, public

---

[1] The request, made pursuant to Const 1963, art 3, § 8, was granted over my dissent and the dissents of Justices KAVANAGH and ADAMS.

[2] CL 1948, § 125.1401 *et seq.* (Stat Ann 1968 Cum Supp § 16.114[1] *et seq.*).

[3] Article 9, § 15 provides:

"The state may borrow money for specific purposes in amounts as may be provided by acts of the legislature adopted by a vote of two-thirds of the members elected to and serving in each house, and approved by a majority of the electors voting thereon at any general election. The question submitted to the electors shall state the amount

or private, except as authorized by other provisions of the Constitution.[4]  I do not read this language as restrictively as do my Brethren.  The State's credit is granted, it seems to me, whether by guaranty of another's debt, by direct State borrowing, by pledge of periodic contributions or, as in Act No 346,[5] by expression of legislative purpose

to be borrowed, the specific purpose to which the funds shall be devoted, and the method of repayment."

[4] Article 9, § 18 provides:
"The credit of the state shall not be granted to, nor in aid of any person, association or corporation, public or private, except as authorized in this constitution."

[5] "Sec. 23.  (1) There is created and established under the jurisdiction and control of the authority a revolving fund to be known as the 'housing development fund'.

"(2) There shall be paid into the housing development fund (a) any moneys appropriated and made available by the state for the purposes of the fund; (b) any moneys which the authority receives in repayment of advances made from the fund, and (c) any other moneys which may be made available to the authority for the purpose of the fund from any other source or sources."  CL 1948, § 125.1423 (Stat Ann 1968 Cum Supp § 16.114[23]).

"Sec. 32.  (1) The authority shall create and establish a special fund to secure the notes and bonds, herein referred to as capital reserve fund, and shall pay into the capital reserve fund (a) any moneys appropriated and made available by the state for the purposes of such fund, (b) any proceeds of sale of notes or bonds, to the extent provided in the resolution of the authority authorizing the issuance thereof, and (c) any other moneys which may be made available to the authority for the purpose of such fund from any other source or sources.  All moneys held in the capital reserve fund, except as hereinafter provided, shall be used solely for the payment of the principal of bonds of the authority as the same mature, the purchase of bonds of the authority, the payment of interest on such bonds of the authority or the payment of any redemption premium required to be paid when such bonds are redeemed prior to maturity.  Moneys in the capital reserve fund shall not be withdrawn therefrom at any time in such amount as would reduce the amount of the fund to less than the maximum amount of principal and interest maturing and becoming due in any succeeding calendar year on all bonds of the authority then outstanding, except for the purpose of paying principal of and interest on bonds of the authority maturing and becoming due and for the payment of which other moneys of the authority are not available.  Any income or interest earned by, or increment to, the capital reserve fund due to the investment thereof may be transferred by the authority to the general reserve fund or other fund of the authority to the extent it does not reduce the amount of the capital reserve fund below the maximum amount of principal and interest maturing and becoming due in any succeeding calendar year on all bonds of the authority then outstanding.

to appropriate public funds to a project as may be needed to accomplish the project's purpose.

The fact that the State's credit has been granted, as I believe Act No 346 grants it, is not in itself a violation of art 9, § 18 of our Constitution, provided authority therefor can be found elsewhere in the Constitution. I find constitutional authority for the State to provide housing for its people too poor to acquire safe and sanitary housing, including authority for the appropriation of public funds and the grant of the State's credit, in the express mandate of Const 1963, art 4, § 51[6] that the legislature pass laws for the protection and promotion of the public health. I agree with Justice ADAMS that the legislature's purpose in enacting Act No 346 was to promote and to protect the public health and general welfare of the people of this State by stimulating the construction[7] of safe and sanitary dwell-

---

"(2)   *  *  *
"(3)   *  *  *
"(4) To assure the continued operation and solvency of the authority for the carrying out of the public purposes of this act, provision is made for the accumulation in the capital reserve fund of an amount equal to the maximum amount of principal and interest maturing and becoming due in .any succeeding calendar year on all bonds of the authority then outstanding. In order further to assure such maintenance of the capital reserve fund, there may be annually apportioned and paid to the authority for deposit in the capital reserve fund such sum, if any, as shall be certified by the chairman of the authority to the governor and budget director as necessary to restore the capital reserve fund to an amount equal to the maximum amount of principal and interest maturing and becoming due in any succeeding calendar year on the bonds of the authority then outstanding. The chairman of the authority if necessary, on or before December 1, shall make and deliver to the governor and budget director his certificate stating the amount required to restore the capital reserve fund and the amount so stated may be apportioned and paid to the authority during the next state fiscal year.
"(5)   *  *  *
"(6)   *  *  *   "   CL 1948, § 125.1432 (Stat Ann 1968 Cum Supp § 16.114[32]).

6 "The public health and general welfare of the people of the state are hereby declared to be matters of primary public concern. The legislature shall pass suitable laws for the protection and promotion of the public health."

7 Whether the State builds the dwellings itself or whether it en-

ing accommodations for low-income or moderate-income families. The fact that the legislature granted the State's credit, as I read Act No 346, does not constitute a violation of art 9, § 18, because it did so in accomplishment of a constitutionally authorized objective.

Thus, in answer to the governor's specific questions, it is my opinion that PA 1966, No 346 violates neither article 9, § 15, nor article 9, § 18. I repeat, however, that I express no opinion on constitutional infirmities that otherwise may exist in the legislation.

---

courages private builders to do so is quite beside the point so long as the objective is a constitutionally authorized one and so long as the means used are not constitutionally proscribed. I have stated my view that the objective of Act No 346 finds constitutional sanction in art 4, § 51. I do not believe that art 4, § 30, which requires a ⅔ vote of the legislature to appropriate public money or property for local or private purposes, has any relevance to the means adopted by the legislature to accomplish its objective. The phrase "local or private purposes" refers to local or private laws which benefit a few or selected individuals or a specified locality as contrasted with public laws that are of general application, as is Act No 346. See *Garner v. Teamsters* (1953), 346 US 485, 494 (74 S Ct 161, 168, 98 L ed 228, 241), and *Allen v. Board of State Auditors* (1899), 122 Mich 324. See, also, *State v. Southern Pine Company* (1949), 205 Miss 80, 93 (38 So 2d 442, 446); *In re Cramer Estate* (1958), 183 Kan 816, 822 (332 P2d 560, 566), certiorari denied *sub nom. Division of National Missions v. Koerner*, 360 US 912 (79 S Ct 1296, 3 L ed 2d 1261); 33 Words and Phrases, "Private Law"; and 172 ALR 1407.