ADVISORY OPINION ON CONSTITUTIONALITY OF 1975 PA 301

Docket No. 57918. Submitted June 8, 1976 (Calendar No. 15).—Decided June 10, 1977.

The Supreme Court granted a request by the House of Representatives for an advisory opinion on the constitutionality of the Job Development Authority Act, 1975 PA 301 (Enrolled Senate Bill 243). The Chief Justice, Justices Coleman and Fitzgerald concurring, wrote:

1. The act does not violate the constitutional prohibition against state involvement in internal improvements because it provides for public internal improvement, an express exception to the constitutional proscription. The Legislature has determined that this program is necessary for the promotion of the public welfare, therefore any internal improvements anticipated by the statute are deemed to be public internal improvements. The benefits accruing to private interests through ownership or use are not sufficient to convert them into unconstitutional non-public improvements.

2. The act does not by its reference to the Municipal Finance Act violate the constitutional prohibition of statutory amendments by reference to title only. The bonds contemplated in 1975 PA 301 are not payable primarily from taxes or special assessments, and therefore the Municipal Finance Act does not apply to the bonds, except that the Job Development Authority

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 72 Am Jur 2d, States, Territories and Dependencies § 1 *et seq.*

[3] 73 Am Jur 2d, Statutes § 137.

[4] 73 Am Jur 2d, Statutes §§ 38, 39.

[5] 63 Am Jur 2d, Public Funds § 60.

   73 Am Jur 2d, Statutes § 14 *et seq.*

[6, 7, 13, 14, 16–19] 72 Am Jur 2d, States, Territories and Dependencies §§ 78–85.

[8] 16 Am Jur 2d, Constitutional Law § 56.

[9] 64 Am Jur 2d, Public Securities and Obligations §§ 1–3.

[10] 16 Am Jur 2d, Constitutional Law § 133.

[11, 12] 16 Am Jur 2d, Constitutional Law § 111.

[15] 16 Am Jur 2d, Constitutional Law § 76.

[20] 64 Am Jur 2d, Public Securities and Obligations § 13.

is required to submit its proposed bonds or notes to the Municipal Finance Commission for approval.

3. The act is a general act and therefore does not require a two-thirds vote of each legislative house and a referendum as a special or local act. The constitutional provision concerning local legislation applies only to legislative action which is limited to some geographical area.

4. The contemplated appropriation of public money to the capital reserve and loan guarantee funds would be for a public and not a private purpose and does not require a two-thirds vote in each legislative house as an appropriation of public funds for private purposes. The "authorization" in the statute for future loan guarantee and capital reserve funds of the Job Development Authority is hortative only and accordingly can neither violate the Constitution nor bind the Legislature. However, because these bonds are issued for a public purpose by a public authority, appropriations to the funds for their repayment are not to be regarded as appropriations for a private or local purpose.

5. The statute establishes a public authority to administer a self-liquidating project whose bonds and notes do not evidence a debt of the state requiring compliance with the borrowing provisions of the Constitution, nor does the act provide for an unconstitutional pledge of the state's credit. The bonds pledge the credit of the Job Development Authority, and are payable from revenue generated by the projects intended to be financed by them. There is no legal obligation by the state on account of these bonds or notes.

Statute declared constitutional.

Justice Levin, joined by Justice Ryan, wrote that the act may be construed so as to be constitutional, but that it may, nevertheless, be unconstitutional as applied. Advisory opinions are inherently abstract answers to abstract questions without factual development. In the instant matter the ultimate resolution of these questions will depend largely on the factual context.

1. The purpose of the debt and credit limitations in the Constitution is to bar the Legislature, without a vote of the people, from incurring, on the credit of the state's general taxing power, obligations payable in the future. While the authority is a separate legal entity, it is a government instrumentality of this state, and is subject to the constitutional debt, credit, and internal improvement limitations. The debt, credit and internal improvement limitations do not apply to self-liquidating revenue bonds, which are not a state debt and do not involve the state in any resulting improvement because

purchasers rely solely on the anticipated revenue and not on the general taxing power, but the limitations cannot be avoided by disclaimers of a legal commitment if there is an effective commitment of the general taxing power.

2. Statutes are presumed to be constitutional, and are to be construed to save them from constitutional infirmity. A court may presume the existence of facts supportive of the constitutionality of legislation. So construed, this act authorizes only the issuance of evidence of indebtedness and the making of guarantees to financial institutions that are payable out of revenue of the authority and such purely discretionary appropriations as the Legislature may choose to make; since the holders of evidences of authority indebtedness and guarantees would then have no call on the "general taxing power", such obligations would not represent state debt, the credit of the state would not have been granted, and it would have no financial interest in the projects aided by the authority.

3. This act may, nevertheless, be unconstitutional as applied. The existence of a permissible purpose cannot sustain an action that has an impermissible effect. Although the authority may appear authorized only to issue and enter into obligations that are secured by revenue and purely discretionary appropriations, it may on a developed record appear that authority obligations would not be accepted by financial institutions or cannot be marketed to the public as self-liquidating and that there has been an effective commitment of the general taxing power and that, therefore, authority obligations are not in fact of the nature and within the principle of the judicially created exception for self-liquidating revenue bonds.

4. There is no basis for indulging assumptions regarding the marketability of the Job Development Authority bonds and of the willingness of financial institutions to accept loan guarantees independent of any commitment of the state's power of taxation. If a tacit understanding evolves which, because of market forces, the Legislature cannot fail to honor, the act, despite disclaimers, would be an effective commitment tantamount to an express commitment within the spirit and purpose of the constitutional limitations. Such constraints on future Legislatures and the people would not create a moral obligation only.

5. A conclusion that the act violates the constitutional limitations, or that authority obligations are not or would not be valid, would not preclude pursuit of the goal of providing increased employment opportunities through governmental subvention of industrial buildings, machinery and equipment; it

would mean that if that goal is to be financed with borrowed money an approving vote of the people is required or the projects financed must support revenue projections without an effective commitment of the general taxing power.

Justice Williams concurred with Justice Levin, principally because of the interaction of two factors. The first factor is that the Job Development Authority Act deals with bond risks that are different from the secure risks of traditional revenue bonds where there is either a firm revenue record or sound engineering revenue projections. The second factor is the very strong emphasis in the act that the Legislature may in the future appropriate to maintain the capital reserve fund at a level to meet bond payments. The first factor alone is not critical, but interacting with the record it creates a situation where reliance is only partially on revenues, and thus partially on the credit of the state, to the extent that the bonds are not revenue bonds, and the act is constitutionally invalid.

Justice Blair Moody, Jr., did not participate in the decision.

### SEPARATE OPINION BY KAVANAGH, C.J.

### COLEMAN and FITZGERALD, JJ.

1. CONSTITUTIONAL LAW—PUBLIC INTERNAL IMPROVEMENTS.

   *The state is not barred from being a party to or interested in any work of internal improvement of a public nature authorized by law (Const 1963, art 3, § 6).*

2. CONSTITUTIONAL LAW—JOB DEVELOPMENT AUTHORITY ACT—PUBLIC INTERNAL IMPROVEMENTS.

   *The Job Development Authority Act provides for works of public internal improvement which is permitted by the Constitution: the Legislature has expressed its determination that this program is necessary for the promotion of the public welfare, and therefore any internal improvements anticipated by the act are deemed to be public internal improvements; the benefits accruing to private interests through ownership or use in this program are not sufficient to convert them into private internal improvements prohibited by the Constitution (Const 1963, art 3, § 6; 1975 PA 301).*

3. CONSTITUTIONAL LAW—JOB DEVELOPMENT AUTHORITY ACT—MUNICIPAL FINANCE ACT—BONDS.

   *The Job Development Authority Act does not violate the constitutional prohibition of statutory amendments by reference to title only by its reference to the Municipal Finance Act; the bonds contemplated by the Job Development Authority Act are not payable primarily from taxes or special assessments, and there-*

fore the Municipal Finance Act does not apply to the bonds, except that the Job Development Authority is required by the Job Development Authority Act to submit its proposed bonds or notes to the Municipal Finance. Commission for approval (Const 1963, art 4, § 25; 1975 PA 301; MCL 131.1 et seq.; MSA 5.3188[1] et seq.).

4. CONSTITUTIONAL LAW—LOCAL ACTS—WORDS AND PHRASES.

The constitutional provision concerning local legislation applies only to legislative action which is limited to some geographical area (Const 1963, art 4, § 29).

5. CONSTITUTIONAL LAW—JOB DEVELOPMENT AUTHORITY ACT—APPROPRIATIONS.

The authorization in the Job Development Authority Act which purports to authorize some subsequent Legislature to appropriate money for loan guarantee and capital reserve funds of the Job Development Authority is hortative only and can neither violate the Constitution nor bind some future Legislature (Const 1963, art 4, § 30; 1975 PA 301).

6. CONSTITUTIONAL LAW—JOB DEVELOPMENT AUTHORITY ACT—BONDS.

The Job Development Authority Act establishes a public authority to administer a self-liquidating project whose bonds and notes do not evidence a debt of the state requiring compliance with the borrowing provisions of the Constitution, nor does the act provide for an unconstitutional pledge of the state's credit (Const 1963, art 9, §§ 12, 15, 18; 1975 PA 301).

SEPARATE OPINION BY LEVIN, J.

RYAN, J.

7. CONSTITUTIONAL LAW—BORROWING LIMITATIONS—BONDS.

The limitations in the Constitution on contraction of debt, granting of credit, and participation in internal improvements do not apply to self-liquidating revenue bonds; they are not a state debt and do not involve the state's credit or involve the state financially in any resulting improvement because purchasers may rely solely on the anticipated revenue and not on the general taxing power (Const 1963, art 3, § 6, art 9, §§ 12, 15, 18).

8. CONSTITUTIONAL LAW—STATUTES—CONSTRUCTION—PRESUMPTIONS.

Statutes are presumed to be constitutional, and are to be construed to save them from constitutional infirmity; a court may

*presume the existence of facts supportive of the constitutionality of legislation.*

9. CONSTITUTIONAL LAW—JOB DEVELOPMENT AUTHORITY ACT—CONSTRUCTION—BORROWING LIMITATIONS.

*The Job Development Authority Act, construed with the presumption of constitutionality, authorizes only the issuance of evidence of indebtedness and the making of guarantees to financial institutions that are payable out of revenue of the Job Development Authority and such purely discretionary appropriations as the Legislature may choose to make; since the holders of evidences of authority indebtedness and guarantees would then have no call on the "general taxing power", such obligations would not represent state debt, the credit of the state would not have been granted, and it would have no financial interest in the projects aided by the authority (Const 1963, art 9, §§ 12, 15, 18; 1975 PA 301).*

10. CONSTITUTIONAL LAW—STATUTES.

*Even if an act does not seem on its face to be unconstitutional, it may be unconstitutional as applied; the existence of a permissible purpose cannot sustain an action that has an impermissible effect.*

11. CONSTITUTIONAL LAW—ADVISORY OPINIONS.

*The Constitution restricts advisory opinions to important questions of law as to the constitutionality of legislation; therefore in the context of an advisory opinion the Supreme Court may not examine questions of fact (Const 1963, art 3, § 8).*

12. CONSTITUTIONAL LAW—JOB DEVELOPMENT AUTHORITY ACT—ADVISORY OPINIONS—BONDS—VALIDITY.

*Whatever may be the advisory opinions of the Justices on the constitutionality of the Job Development Authority Act, no opinion can be expressed on the validity of Job Development Authority obligations except in adjudicating an actual controversy upon development of the facts regarding the issuance and making of such obligations (Const 1963, art 3, § 8; 1975 PA 301).*

13. CONSTITUTIONAL LAW—BORROWING LIMITATIONS—STATE AUTHORITIES.

*A state authority, which, although a separate legal entity, is a government instrumentality of the state, is subject to the constitutional limitations on debt, credit, and internal improvements; if the limitations do not apply to a state authority they*

are readily circumvented (Const 1963, art 3, § 6, art 9, §§ 12, 15, 18).

14. CONSTITUTIONAL LAW—BORROWING LIMITATIONS—TAXING POWER.

*The constitutional limitations on debt, credit, and internal improvements cannot be avoided by disclaimers of a legal commitment of the state if there is an effective commitment of the general taxing power (Const 1963, art 3, § 6, art 9, §§ 12, 15, 18).*

15. CONSTITUTIONAL LAW—CONSTRUCTION.

*Words in a constitution do not receive a narrow, contracted meaning but are presumed to have been used in a broad sense, with a view of covering all contingencies; hence the words are read, not as legislative codes which are subject to continuous revision with the changing course of events, but as the revelation of the great purposes which were intended to be achieved by the Constitution as a continuing instrument of government.*

16. CONSTITUTIONAL LAW—BORROWING LIMITATIONS—CONSTRUCTION.

*The purpose of the debt and credit limitations of the Constitution is to bar the Legislature, without a vote of the people, from incurring, on the credit of the state's general taxing power, obligations payable in the future (Const 1963, art 9, §§ 12, 15, 18).*

17. CONSTITUTIONAL LAW—BORROWING LIMITATIONS—TAXING POWER —SELF-LIQUIDATING BONDS.

*Self-liquidating revenue bonds do not violate the limitations on debt in the state Constitution, not because of disclaimers, but because purchasers and the market understand that no pledge of general tax revenue is involved; there is no constraint on the state to make up the deficiency if there is a default (Const 1963, art 9, § 12).*

18. CONSTITUTIONAL LAW—JOB DEVELOPMENT AUTHORITY ACT—BONDS —BORROWING PROVISIONS.

*It may appear on a full factual record that the Job Development Authority Act, despite disclaimers, would be an effective commitment tantamount to an express commitment of the state's power of taxation within the spirit and purpose of the constitutional limitations on borrowing if a tacit understanding evolves which, because of market forces, the Legislature cannot fail to honor under the constraint of adverse implications for the holders of state obligations and consequent impairment of the borrowing capacity of the state and its subdivisions (Const 1963, art 9, §§ 12, 15, 18; 1975 PA 301).*

19. CONSTITUTIONAL LAW—JOB DEVELOPMENT AUTHORITY ACT—BOR-
    ROWING PROVISIONS.

> *A conclusion that the Job Development Authority Act violates
> the constitutional borrowing limitations, or that Job Develop-
> ment Authority obligations are not or would not be valid,
> would not preclude pursuit of the goal of providing increased
> employment opportunities through governmental subvention of
> industrial buildings, machinery and equipment; it would mean
> that if that goal is to be financed with borrowed money an
> approving vote of the people is required or the projects financed
> must support revenue projections without an effective commit-
> ment of the general taxing power (Const 1963, art 9, §§ 12, 15,
> 18; 1975 PA 301).*

SEPARATE OPINION BY WILLIAMS, J.

20. CONSTITUTIONAL LAW—JOB DEVELOPMENT AUTHORITY ACT—
    BONDS.

> *The Job Development Authority Act deals with bond risks that
> are different from the secure risks of traditional revenue bonds
> that the bond buyer can rely on and there is a very strong
> emphasis in the act that the Legislature may in the future
> appropriate to maintain the capital reserve fund of the Job
> Development Authority at a level to meet bond payments; the
> interaction of these two factors creates a situation where
> reliance is only partly on revenues and thus partially on the
> credit of the state, to the extent that the bonds are not revenue
> bonds; the act is constitutionally invalid (1975 PA 301).*

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General.

*Harry G. Iwasko, Jr.,* and *Robert Ianni,* Assistants Attorney General, in support of constitutionality.

*John D. Pirich,* Assistant Attorney General, in opposition to constitutionality.

Amicus Curiae:

*Miller, Canfield, Paddock & Stone* (by *Stratton S. Brown, Robert E. Gilbert* and *William J. Dan-*

*hof)* for the Greater Detroit Chamber of Commerce.

KAVANAGH, C. J. We have been requested to render an advisory opinion on the compliance of the Derezinski-Geerlings Job Development Authority Act with certain provisions of the Michigan Constitution of 1963. The purpose of the legislation (hereinafter PA 301) is stated in § 2 of MCLA 125.1702, MSA 3.540 (102):

"(1) The legislature hereby finds and declares:

(a) That there is a statewide pressing need for programs to alleviate and prevent conditions of unemployment; to preserve existing jobs and create new jobs to meet the employment demands of population growth; to promote the development of present business enterprises and to meet the growing competition for business enterprises; to revitalize and diversify the Michigan economy in general and achieve the goals of economic growth and full employment.

"(b) That, for the preservation and betterment of the health, safety, and general welfare of the people of Michigan, it is necessary to promote and develop new and adequate water and air pollution control and solid waste disposal equipment for the facilities of business enterprises and public utilities located in this state.

"(c) That the goals of full employment and maximum economic growth can best be provided by the promotion, attraction, stimulation, retention, rehabilitation, and revitalization of business enterprises.

"(d) That the present and future health, safety, and general welfare of the people of Michigan require as a public purpose the promotion and development of new and expanded business enterprises, and means to facilitate their compliance with state, national, and local standards for pollution control.

"(e) That the retention, promotion, diversification and development of industry and commerce require additional means of financing, to help existing business

enterprises expand more rapidly and to promote the location of additional business enterprises in Michigan.

"(f) That the retention and expansion of existing industry and commerce and the acquiring of new industry and commerce to Michigan requires the availability of energy supplies and that, to this end, known sources of energy in Michigan should be developed to the fullest extent possible consistent with environmental protection and ecological preservation.

"(2) It is therefore hereby declared to be the policy of the state of Michigan that to promote the health, safety, right to gainful employment, business opportunities, and general welfare of the residents thereof a body corporate and politic to be known as the Michigan job development authority shall be created to carry out this act and shall exist and operate for the public purpose of alleviating and preventing unemployment by the retention, promotion, and development of industrial buildings, including the sites therefor and machinery and equipment including water and air pollution control and solid waste disposal equipment with respect thereto or for use by business enterprises, including the training and/or retraining of business enterprise employees affected by the expansion or reduction of the labor force resulting from labor efficiency improvements."

In brief we find:

(1) PA 301 does not violate Const 1963, art 3, § 6 prohibiting state involvement in internal improvements because it provides by law for public internal improvement, an express exception to that constitutional proscription.

(2) PA 301 does not violate Const 1963, art 4, § 25 which prohibits statutory amendments by reference to title only, because PA 301 does not have the amendatory effect asserted.

(3) PA 301 does not violate Const 1963, art 4, § 29 prohibiting enactment of special or local acts without a two-thirds vote of each legislative house and a referendum, because it is a general act.

(4) PA 301 does not violate Const 1963, art 4, § 30 which proscribes legislative appropriations of public funds for private purposes without a two-thirds vote in each legislative house because the contemplated appropriation of public moneys to the capital reserve and loan guarantee funds would be for a public and not a private purpose.

(5) That PA 301 does not violate Const 1963, art 9, §§ 12, 15, and 18 because it establishes a public authority to administer a self-liquidating project whose bonds and notes do not evidence a debt of the state requiring compliance with the state borrowing provisions of § 15, nor does the act provide for a pledge of the state's credit.

We have been aided in this undertaking by the office of the Attorney General which has submitted one brief in support of the conclusion of constitutionality and one brief in support of the conclusion of unconstitutionality and by the Greater Detroit Chamber of Commerce which has filed a brief as amicus curiae supporting the conclusion of constitutionality. We are grateful for this assistance.

## Article 3

Michigan's first Constitution of 1835 stated that internal improvement should be encouraged and that the legislature had the duty to provide therefor. The large debt incurred by the state for the construction of railroads and canals prompted the ban in the Constitution of 1850 on the state's being a party to or interested in any work of internal improvement, and from subscribing to or being interested in any company, association or corporation, or loaning its credit in aid of any person, association or corporation.

These bans were continued in the constitution of

1908 but repeated amendments were adopted to provide specific exceptions. After the final amendment in 1946, Const 1908, art 10, § 14 read:

"The state shall not be a party to, nor be interested in, any work of internal improvement, nor engage in carrying on any such work, except:
"1. In the development, improvement and control of or aiding in the development, improvement and control of public roads, harbors of refuge, water-ways, airways, airports, landing fields and aeronautical facilities;
"2. In the development, improvement and control of or aiding in the development, improvement and control of rivers, streams, lakes and water levels, for purposes of drainage, public health, control of flood waters and soil erosion;
"3. In reforestation, protection and improvement of lands in the state of Michigan;
"4. In the expenditure of grants to the state of land or other property."

The debate over continuing this ban occupied much of the time of the delegates to the convention which drafted the Constitution of 1963.

This ban was included as Const 1963, art 3, § 6:

"The state shall not be a party to, nor be financially interested in, any work of internal improvement, nor engage in carrying on any such work, except for public internal improvements provided by law."

The "Address to the People" summed up the intended effect of the section:

"This is a revision of § 14, art X of the present constitution deleting detailed language listing exceptions relative to internal improvements in which the state may engage.
"The new, abbreviated wording makes it clear that the state 'may not be a party to' nor 'financially inter-

ested' in internal improvements other than those of a public nature and by authorization of law." 2 Official Record, Constitutional Convention 1961, p 3368.

What is equally clear from the abbreviated wording is that the state is no longer barred from being a party to or interested in any work of internal improvement of a public nature authorized by law.

In answering the question whether PA 301 ignores this ban we posit that all works contemplated under the act are works of internal improvement, for otherwise there is no constitutional impediment.

Our inquiry must be limited to whether they are works of "public" or "non-public" internal improvement for "public" works are expressly excepted from the ban.

We are unaided by definition of these words in the constitution. One of the most helpful discussions we found was Justice COOLEY's exposition on the word "public" in determining whether an act had a "public purpose" in *People ex rel Detroit & H R Co v Salem Twp Board,* 20 Mich 452, 475–476 (1870):

"I propose first to enquire whether the purpose to be accomplished by the act in question is a *public* purpose, in the sense implied when burdens are to be imposed under the legislative power over the subject of taxation.

"I do not understand that the word *public,* when employed in reference to this power, is to be construed or applied in any narrow or illiberal sense, or in any sense which would preclude the Legislature from taking broad views of State interest, necessity or policy, or from giving those views effect by means of the public revenues. Necessity alone is not the test by which the limits of State authority in this direction are to be defined, but a wise statemanship must look beyond the

expenditures which are absolutely needful to the continued existence of organized government, and embrace others which may tend to make that government subserve the general well-being of society, and advance the present and prospective happiness and prosperity of the people. To erect the public buildings, to compensate the public officers and to discharge the public debts, are not the sole purposes to which the public revenues may be applied, but, on the contrary, considerations of natural equity, gratitude and charity are never out of place when the general good of the whole people is in question, and may be kept in view in the imposition of the public burdens. The sovereign legislative authority must judge of the force of such considerations, on a general view of the just and proper demands upon the public treasury, and of the ability of the people to provide for all; and when that authority determines that such payments will subserve the public good, the responsibility of the legislator for the correctness of his judgment must be to the people whose representative he is, and upon whom the burdens he imposes must rest."

The Legislature has expressed its determination that this program is necessary for the promotion of the public welfare. From this we conclude that any internal improvements anticipated therein are deemed to be public internal improvements. We do not regard the benefits accruing to private interests in this program through ownership or use sufficient to convert the internal improvements into "non-public" or private internal improvements still under the ban.

We are satisfied that PA 301 provides for works of public internal improvement.

### Article 4

A) It is asserted that § 21(5) of PA 301 has the effect of amending the Municipal Finance Act and

consequently violates Const 1963, art 4, § 25, which reads as follows:

"No law shall be revised, altered or amended by reference to its title only. The section or sections of the act altered or amended shall be re-enacted and published at length."

MCLA 131.1 *et seq.;* MSA 5.3188(1) *et seq.* is known as the Municipal Finance Act and it provides in pertinent section as follows:

"Sec. 2. The following definitions shall apply for the purposes of this act unless the context shall otherwise indicate:

"(a) 'Municipality': Any * * * governmental authority or agency within the state with power to issue any of the obligations authorized or regulated under this act.

\* \* \*

"(c) 'Obligation': A general term for evidences of indebtedness such as bonds, refunding bonds, notes, certificates of indebtedness and other like instruments (except those obligations authorized by Act No. 79 of the Public Acts of 1937) issued by a municipality, which on their face pledge the full faith and credit of the municipality and/or are payable primarily from taxes and/or special assessments."

Because the bonds contemplated in PA 301 are not "payable primarily from taxes and/or special assessments" we do not consider the Municipal Finance Act to have any application to act-301 bonds, except as expressly provided in PA 301.

PA 301 provides in § 21(5), MCLA 125.1721(5); MSA 3.540(121)(5):

"Bonds or notes issued by an authority shall be approved by the municipal finance commission before

their issuance but shall not otherwise be subject to Act No. 202 of the Public Acts of 1943, as amended, being sections 131.1 to 138.2 of the Michigan Compiled Laws. Before approving the issuance of the bonds or notes the municipal finance commission shall determine that the amount of the proposed issue is sufficient but not excessive, that the revenue and properties pledged for the payment thereof are sufficient and that the bonds or notes and the proceedings authorizing the same comply with this act and other applicable law, but nothing in this section shall be construed as authorizing the municipal finance commission to substitute its judgment for that of the authority in the authority's evaluation of the efficacy of the proposed project and its relationship to job development in the state."

The use of the indefinite article "an" in the first sentence of this section is somewhat confusing, but we are satisfied it is an error and the reference was meant to be to "the" authority established by the act.

We read this section to require the authority to submit its proposed bonds or notes to the Municipal Finance Commission for its approval and determination that the amount of the proposed issue is sufficient but not excessive (for the purpose for which issued) that the revenue and properties pledged for their payment are sufficient and that the bonds or notes and the proceedings authorizing them comply with the job development act and other applicable law.

We regard this section as imposing strictures on the authority to the extent indicated but do not consider it as intended to have or as having the effect of amending the Municipal Finance Act or any other law.

For this reason we find this section does not violate Const 1963, art 4, § 25.

B) Does PA 301 create a corporation by special

act in violation of Const 1963, art 4, § 29, which reads as follows:

"The legislature shall pass no local or special act in any case where a general act can be made applicable, and whether a general act can be made applicable shall be a judicial question. No local or special act shall take effect until approved by two-thirds of the members elected to and serving in each house and by a majority of the electors voting thereon in the district affected. Any act repealing local or special acts shall require only a majority of the members elected to and serving in each house and shall not require submission to the electors of such district."

The history and rationale of this provision, which first appeared in the Constitution of 1908, was set forth by Justice Brooke in *Attorney General ex rel Dingeman v Lacy,* 180 Mich 329, 337–338; 146 NW 871 (1914):

"Considering the history of legislation under the Constitution of 1850, it is apparent that there had grown up a pernicious practice on the part of the legislature in passing local acts. The practice was bad in two very important particulars. In the first place, much of the legislation thus enacted constituted a direct and unwarranted interference in purely local affairs and an invasion of the principles of local self-government. In the second place, such legislation affecting as it did certain limited localities in the State, the senators and representatives from unaffected districts were usually complaisant, and agreed to its enactment without the exercise of that intelligence and judgment which all legislation is entitled to receive from all the members of the legislature. This course led to many abuses (principally in amendments to city charters), some of which found their way into the courts, and were there redressed so far as the Constitution then in force would permit.

"With these evils in mind, the Constitution of 1909

*[sic]* was formulated and adopted by the people. From a reading of the provisions above quoted and others of a similar character, it is, we think, entirely clear that it was the settled purpose of the framers of the new instrument and of the people who adopted it to forever insure to the people the right to control their affairs purely local, and to secure for all general legislation grave attention and the application of the collective wisdom of the legislators."

The retention of it in the Constitution of 1963 followed this explanation by the committee chairman:

"Mr. Hoxie, chairman of the committee on legislative powers, submits the following reasons in support of Committee Proposal 119:

"The committee recommends the retention of this section first found in the 1908 constitution. The purpose of the section, along with the home rule provision, is to lift the burden from the legislature of passing private and local legislation.

"The only changes recommended are to clear up ambiguous language and to remove a date, now unimportant.

"The requirement of a 2/3 vote of both houses and a majority vote in the area affected protects localities against arbitrary action.

"By allowing a majority of the legislature to repeal existing local laws, uniformity will be easier to obtain." 2 Official Record, Constitutional Convention 1961, p 2415.

From the foregoing and from a careful reading of § 29 we are convinced that this section properly has application only to legislative action which is limited to some geographical area.

We do not read PA 301 as so limited and accordingly find in it no violation of Const 1963, art 4, § 29.

C) Does the appropriation of public funds as authorized in §§ 31 to 48 of PA 301 require the assent of two-thirds of the Legislature as provided in Const 1963, art 4, § 30 which reads as follows:

"The assent of two-thirds of the members elected to and serving in each house of the legislature shall be required for the appropriation of public money or property for local or private purposes."

The Legislature which adopted PA 301 has purported to authorize some subsequent Legislature to appropriate money for the loan guarantee funds and capital reserve funds of the Job Development Authority. This "authorization" is hortative only and accordingly can neither violate Const 1963, art 4, § 30 nor bind some future Legislature.

However, being of the view that these bonds are issued for a public purpose by a public authority, we would not regard appropriations to the funds for this repayment as appropriations for a private or local purpose.

## ARTICLE 9

The Job Development Authority created by PA 301 is authorized to raise revenue through the issuance of its bonds or notes. From these revenues, the authority is authorized to extend loans directly to, or to guarantee loans made by private lenders to business enterprises for financing projects defined in the act.

We are asked:

(1) if the bonds or notes issued pursuant to the act

(a) are evidence of state indebtedness proscribed by Const 1963, art 9, § 12 which reads:

"No evidence of state indebtedness shall be issued except for debts authorized pursuant to this constitution."

(b) require compliance with Const 1963, art 9, § 15 which reads:

"The state may borrow money for specific purposes in amounts as may be provided by acts of the legislature adopted by a vote of two-thirds of the members elected to and serving in each house, and approved by a majority of the electors voting thereon at any general election. The question submitted to the electors shall state the amount to be borrowed, the specific purpose to which the funds shall be devoted, and the method of repayment."

(2) We are also asked if the contemplated loans or guarantees of loans by the authority is a violation of Const 1963, art 9, § 18 which reads:

"The credit of the state shall not be granted to, nor in aid of any person, association or corporation, public or private, except as authorized in this constitution."

(1)(a) The act requires that the individual bonds and notes carry language to this effect:

"The state shall not be liable on notes or bonds of the authority nor shall the notes or bonds be considered a debt of the state. The notes and bonds shall contain on the face thereof a statement indicating this fact." MCLA 125.1727; MSA 3.540(127).

Thus these notes or bonds will not purport to be evidence of a state debt. They will not purport to pledge the state's credit. They will, in fact, purport to be the debt and pledge of credit of the Job Development Authority.

Unless we are prepared to say that the authority is a sham or subterfuge employed by the state to avoid this constitutional ban and is therefore in legal effect the state itself, we have no reason to blink at the clear terms of the instruments.

We are satisfied that the authority, while an instrumentality of the state, is a legitimate legal entity apart from the state and accordingly hold that its notes and bonds will not be evidence of state debt contrary to Const 1963, art 9, § 12.

(1)(b) We are also satisfied that the bonds or notes contemplated in PA 301 are revenue bonds or notes—payable from the revenues generated by the projects intended to be financed thereby.

We held in *Schureman v State Highway Commission,* 377 Mich 609; 141 NW2d 62 (1966), that Const 1963, art 9, § 15 does not apply to revenue bonds. That decision controls here unless it be said that the provision in PA 301 for permissive appropriations to the capital reserve and loan guarantee funds converts these bonds or notes into something other than revenue bonds or notes.

We are of the opinion that neither the provision for permissive appropriation in PA 301 nor some future actual appropriation would alter the status of these as revenue bonds or notes.

The suggestion is made that provision for the possibility of such future appropriation gives rise to a "moral obligation" in the Legislature to make the appropriations, and that "as a matter of policy" the state could not refuse to do so, or indeed to pay the bonds or notes if the authority default.

We are keenly aware of that possibility. But we deal with legal obligations. The Constitution confides such "policy" and "moral" determinations to the Legislature.

We see no legal obligation on the part of the

state on account of these bonds or notes. We regard them as true revenue bonds or notes.

(2) As we have said, we consider that the Job Development Authority is a legal entity separate from the State of Michigan. For this reason when it makes loans from its funds or guarantees loans made by others it does not involve the credit of the State of Michigan.

We are of the opinion that PA 301 does not violate the Constitution of 1963 in the particulars herein considered.

COLEMAN and FITZGERALD, JJ., concurred with KAVANAGH, C. J.

LEVIN, J. The Justices have been asked for their opinions regarding the constitutionality of 1975 PA 301[1] creating the Job Development Authority.

The principal questions are whether the act is violative of the constitutional provisions limiting the issuance of evidence of state indebtedness,[2] the granting of the credit of the state[3] and the state being interested in any work of internal improvement other than a public internal improvement.[4]

---

[1] MCLA 125.1701, et seq.; MSA 3.540(101), et seq.

[2] "No evidence of state indebtedness shall be issued except for debts authorized pursuant to this constitution." Const 1963, art 9, § 12.

"The state may borrow money for specific purposes in amounts as may be provided by acts of the legislature adopted by a vote of two-thirds of the members elected to and serving in each house, and approved by a majority of the electors voting thereon at any general election. The question submitted to the electors shall state the amount to be borrowed, the specific purpose to which the funds shall be devoted, and the method of repayment." Id, § 15.

[3] "The credit of the state shall not be granted to, nor in aid of any person, association or corporation, public or private, except as authorized in this constitution." Id, § 18.

[4] "The state shall not be a party to, nor be financially interested in, any work of internal improvement, nor engage in carrying on any such work, except for public internal improvements provided by law." Id, art 3, § 6.

Advisory opinions are, inherently, abstract answers to abstract questions without factual development. At times an adequate response may be made without a factual predicate, but in the instant matter the ultimate resolution of these questions will depend largely on the factual context.

I

The Job Development Authority was created "for the public purpose of alleviating and preventing unemployment[5] by the retention, promotion and development" of industrial buildings, machinery and equipment,[6] and for that purpose the authority may make loans, and participate in making loans with and guarantee loans by financial institutions.[7]

The authority is expected to finance its operations with borrowed money, and is authorized to "[i]ssue its bonds or notes for the purpose of making loans for project costs" and to secure "bonds by mortgage, assignment, or pledge of any or all of its moneys, revenues, income, or properties".[8] Before bonds or notes may be issued, the Municipal Finance Commission is required to determine "that the revenue and properties pledged for the payment thereof are sufficient";[9] loan guarantees are not subject to this requirement.

---

[5] The constitutionality of this act cannot be sustained simply because of the importance of the ends to be furthered. Unemployment is a serious, pervasive and socially corrosive problem. Yet the people of this state have spoken through the Constitution which, through the debt and credit limitations, seeks to preserve the fiscal integrity of the state. However important, necessary or timely a particular government venture may be, this Court is obliged to invalidate legislation that exceeds the powers granted by the people to their government.

[6] MCLA 125.1702; MSA 3.540(102).

[7] MCLA 125.1713, 125.1756, 125.1741; MSA 3.540(113), 3.540(156), 3.540(141).

[8] MCLA 125.1714; MSA 3.540(114).

[9] MCLA 125.1721; MSA 3.540(121).

The act provides that "[t]he state shall not be liable on notes or bonds of the authority nor shall the notes or bonds be considered a debt of the state,"[10] and that it "shall not be construed * * * to be a pledge of the credit of the state for the payment of the authority's bonds, notes, or loan guarantees".[11]

Where a loan is guaranteed by the authority, the lending financial institution is required to pay "a loan guarantee fee not to exceed 1% of the guaranteed portion of the outstanding loan principal per annum".[12]

Loan guarantee fees are to be deposited in a loan guarantee fund to secure such obligations. An amount equal to 10% of the outstanding guaran-

---

[10] "The state shall not be liable on notes or bonds of the authority nor shall the notes or bonds be considered a debt of the state. The notes and bonds shall contain on the face thereof a statement indicating this fact." MCLA 125.1727; MSA 3.540(127).

[11] "This act shall not be construed to authorize the giving or lending of the credit of this state to the job development authority or to any business enterprise or to be a pledge of the credit of the state for the payment of the authority's bonds, notes, or loan guarantees. The bonds, notes, and loan guarantees shall remain solely the indebtedness of the authority, according to their term and tenor and as provided in this act. Excepting only the policy of this state set out in sections 31 to 48 of this act wherein the state is authorized but not obligated to appropriate moneys to the capital reserve fund and the loan guarantee fund, this act shall not be construed as obligating this state to the holders of the bonds nor as constituting a contract on the part of this state to make money available for the authority's reserve funds. However, the state pledges and agrees with the holders of bonds and notes issued and loan guarantees made under this act that it will not limit or alter the rights vested in the authority to fulfill the terms of agreements made with the holders of the notes, bonds, and loan agreements consistent herewith, or in any way impair the rights and remedies of the holders thereof until the bonds, notes, and loan guarantees, together with the interest thereon, with interest on unpaid installments of interest, and costs and expenses for which the authority is liable in connection with an action or proceeding by or on behalf of the holders, are fully paid and discharged. The authority may include this pledge and agreement of the state in agreements it may make with the holders of bonds, notes, and loan guarantees." MCLA 127.1761; MSA 3.540(161).

[12] MCLA 125.1743; MSA 3.540(143).

tees is required to be maintained in that fund;[13] implicit in this requirement is that the fund, at least at the outset, will be made up with proceeds of borrowings by the authority or legislative appropriations.

The authority is also required to create a capital reserve fund "to secure bonds or notes as the authority shall determine"[14] to be funded in "an amount equal to the maximum amount of principal and interest maturing and becoming due in a succeeding calendar year on bonds of the authority secured by the capital reserve fund then outstanding".[15] It appears to be contemplated that proceeds of borrowings will be used to establish this fund.[16]

The act provides: "To further assure" the maintenance of the capital reserve[17] and loan guarantee[18] funds there may be annually appropriated[19] and paid to the authority the amount required to restore any deficiency in the statutorily required funding, as certified by the chairman of the authority. The chairman is required "if necessary"[20] (because authority income[21] proves to be inadequate) annually to certify to the Governor and the Director of the Department of Management and Budget, shortly before the Governor's annual budget message, any amount required to restore the capital reserve and loan guarantee funds, "and

---

[13] MCLA 125.1744, 125.1745; MSA 3.540(144), 3.540(145).

[14] MCLA 125.1731; MSA 3.540(131).

[15] MCLA 125.1734, 125.1732, 125.1731; MSA 3.540(134), 3.540(132), 3.540(131).

[16] MCLA 125.1732; MSA 3.540(132).

[17] MCLA 125.1734; MSA 3.540(134).

[18] MCLA 125.1746; MSA 3.540(146).

[19] The word "apportioned" is used in the provision regarding the capital reserve fund. MCLA 125.1734; MSA 3.540(134).

[20] MCLA 125.1734, 125.1746; MSA 3.540(134), 3.540(146).

[21] Interest on direct or participation loans, fees for loan guarantees, earnings from investments and the sale or lease of projects.

the amount so stated may be appropriated [by the Legislature] and paid to the authority during the next fiscal year".[22] The act provides:

"*Excepting only the policy of this state* set out in sections 31 to 48 of this act wherein the state is authorized but not obligated to appropriate moneys to the capital reserve fund and the loan guarantee fund, this act shall not be construed as obligating this state to the holders of the bonds nor as constituting a contract on the part of this state to make money available for the authority's reserve funds."[23] (Emphasis supplied.)

## II

It is established that the debt, credit and internal improvement limitations do not apply to self-liquidating revenue bonds;[24] they are not state debt and do not involve the state's credit or involve the state financially in any resulting improvement because purchasers may rely solely on the anticipated revenue and not on the general taxing power:

"The idea that some borrowed money is not a debt comes from cases approving the funding of 'self-liquidating public works' through 'revenue bonds.' " *Advisory Opinion re Constitutionality of 1973 PA 1 & 2,* 390 Mich 166, 176; 211 NW2d 28 (1973).

"A continuing line of cases since *Young [v Ann Arbor,* 267 Mich 241; 255 NW 579 (1934)] reaffirm the

---

[22] MCLA 125.1734, 125.1746; MSA 3.540(134), 3.540(146).

[23] MCLA 125.1761; MSA 3.540(161).

[24] *See Bullinger v Gremore,* 343 Mich 516, 562–563; 72 NW2d 777 (1955) (state credit; debt limitation on local units of government); *Dearborn v Michigan Turnpike Authority,* 344 Mich 37, 58–59, 66–67; 73 NW2d 544 (1955) (state credit; evidence of state indebtedness); *Gaylord v Gaylord City Clerk,* 378 Mich 273, 289–291, 292–294; 144 NW2d 460 (1966) (internal improvement; state credit); *Alan v Wayne County,* 388 Mich 210, 292–294; 200 NW2d 628 (1972) (debt limitations).

principle that as a *constitutional definition,* 'self-liqui-dating revenue bonds' do not obligate the general taxing power and hence do not create a debt subject to debt limitations." *Alan v Wayne County,* 388 Mich 210, 293; 200 NW2d 628 (1972) (emphasis by the Court).

Proponents contend that holders of authority obligations may look only to the income of the authority and such amounts as the Legislature may choose to appropriate to fund deficiencies, and therefore its obligations are self-liquidating in the same sense as revenue bonds and hence exempt from the constitutional limitations.

It is a familiar principle that statutes are presumed to be constitutional, that they are to be construed to save them from constitutional infirmity and that a court may presume the existence of facts supportive of the constitutionality of legislation.[25]

So construed, this act authorizes only the issuance of evidence of indebtedness and the making of guarantees to financial institutions that are payable out of revenue of the authority and such purely discretionary appropriations as the Legislature may choose to make; since the holders of evidences of authority indebtedness and guarantees would then have no call on the "general taxing power," such obligations would not represent state debt, the credit of the state would not have been granted and it would have no financial interest in the projects aided by the authority.

This act may, nevertheless, be unconstitutional. Even if an act does not seem on its face to be unconstitutional, it may be unconstitutional as applied. *Yick Wo v Hopkins,* 118 US 356, 373; 6 S Ct 1064; 30 L Ed 220 (1886). "If the direct effect is

---

[25] 16 Am Jur 2d, Constitutional Law, §§ 137, 144 and 143, pp 336, 345 and 343.

not constitutionally offensive however, we must look for any indirect effect. An indirect effect is no more legitimate than a direct effect, and we must assay the effect apart from the purpose. 'The existence of a permissible purpose cannot sustain an action that has an impermissible effect.' " *Gallegos v Glaser Crandell Co,* 388 Mich 654, 672; 202 NW2d 786 (1972) (opinion by T. G. KAVANAGH, J.).

Although the authority may appear authorized only to issue and enter into obligations that are secured by revenue and purely discretionary appropriations, it may on a developed record appear that authority obligations would not be accepted by financial institutions or cannot be marketed to the public as self-liquidating and that there has been an effective commitment of the general taxing power and, therefore, authority obligations are not in fact of the nature and within the principle of the judicially created exception for self-liquidating revenue bonds.

### III

The presumption of constitutionality is "a presumption of fact, of the existence of factual conditions supporting the legislation. As such, it is a rebuttable presumption. [Citations omitted.] It is not a conclusive presumption, or a rule of law which makes legislative action invulnerable to constitutional assault. * * * [I]t is increasingly important that when it becomes necessary for the Court to deal with the facts relating to particular commercial or industrial conditions, they should be presented concretely with appropriate determinations upon evidence, so that conclusions shall not be reached without adequate factual support."

*Borden's Farm Products Co v Baldwin,* 293 US 194, 209–210; 55 S Ct 187; 79 L Ed 281 (1934).

The economic facts and assumptions of underwriting and marketing so-called moral obligation bonds of a state authority and of financial institution acceptance of state authority guarantees are outside the sphere of judicial notice.

Michigan's Constitution restricts advisory opinions to "important questions of law * * * as to the constitutionality of legislation". Const 1963, art 3, § 8. "It would appear, therefore, that in the context of an advisory opinion, we may not examine questions of fact." *Advisory Opinion re Constitutionality of 1972 PA 294,* 389 Mich 441, 483; 208 NW2d 469 (1973) (opinion by Levin, J.).

A favorable opinion regarding the constitutionality of this act may be read by the public and the financial community as an expression of this Court's opinion not only regarding the specific questions asked by the Governor but also that the authority's obligations are not susceptible to constitutional challenge. To avoid misapprehension, it must be stressed that whatever may be the opinions of the Justices on the *constitutionality* of the act, no opinion can be expressed on the *validity* of authority obligations, whether they are of the nature of self-liquidating revenue bonds, the credit of the state has been granted in making a loan guarantee, or the state has become financially interested in a prohibited work of internal improvement.

The validity of authority obligations and the constitutionality of the act as applied can only be determined in adjudicating an actual controversy upon development of the facts regarding the issuance and making of such obligations. Indeed even an appearance of facial constitutionality might yield to facts developed at a testimonial hearing.

"Although an advisory opinion is not an adjudicative decision of the Court and is not binding in the same sense a decision of the Court after a hearing on the merits constitutes a precedent under the doctrine of stare decisis, our advisory opinions are read by the public, the profession, the Governor and the Senate as a definitive expression of our views. Any such expression must be carefully circumscribed so as not to inhibit a seemingly different determination in a case where the contending parties have had an opportunity to present relevant facts, adjudicative as well as constitutional.

"When a court holds an act to be constitutional it does no more than deny a particular claim of unconstitutionality. It ought not, by premature expressions on generalized abstract claims, to appear to foreclose persons differently situated from advancing more concrete claims of unconstitutionality." *Advisory Opinion re Constitutionality of 1972 PA 294, supra,* 483–484 (opinion by LEVIN, J.).

## IV

While the authority is a separate legal entity, it is declared to be a "government instrumentality of this state,"[26] and is subject to the constitutional debt, credit and internal improvement limitations.[27] *People ex rel Bay City v State Treasurer,*

---

[26] MCLA 125.1711; MSA 3.540(111).

[27] The concept that the debt and credit limitations apply to instrumentalities of the state, although organized as separate entities, has been recognized in other cases. *Bacon v Kent-Ottawa Metropolitan Water Authority,* 354 Mich 159, 174; 92 NW2d 492 (1958); *Gaylord v Gaylord City Clerk, supra,* p 291; *Oakland County Drain Commissioner v Royal Oak,* 306 Mich 124, 142; 10 NW2d 435 (1943); *Connor v Herrick,* 349 Mich 201, 216; 84 NW2d 427 (1957) (opinion by CARR, J.); *Huron-Clinton Metropolitan Authority v Boards of Supervisors of Five Counties,* 300 Mich 1, 23; 1 NW2d 430 (1942).

Courts in other jurisdictions have held similarly, enforcing state debt limitations where separate entities were involved. *State ex rel Saxbe v Brand,* 176 Ohio St 44; 197 NE2d 328, 331 (1964); *Reynolds v Waterville,* 92 Me 292; 42 A 553, 556–557 (1898); *Ayer v Commissioner of Administration,* 340 Mass 586, 598; 165 NE2d 885, 892 (1960); *State ex rel Public Institutional Building Authority v Griffith,*

23 Mich 499 (1871).[28] "The creation of a separate body corporate does not alter the essence of the scheme." *State ex rel Nevada Building Authority v Hancock,* 86 Nev 310, 314; 468 P2d 333, 336 (1970).

If the limitations on the creation of state debt and the granting of its credit do not apply to a state authority they are readily circumvented. It would be possible to organize a large part of the business of government through authorities in the various departments, *e.g.,* an educational authority, a welfare authority, a mental health authority, all of which might seek to borrow money in anticipation of "discretionary" appropriations without regard to the constitutional limitations on issuance of short-term and long-term debt.

Nor can these limitations be avoided by disclaimers of a legal commitment if there is an effective commitment of the general taxing power. 1973 PA 2 provided that the state notes there involved "shall not be a general obligation of the state, shall not pledge the full faith and credit of the state and shall not be an indebtedness of the state". Nevertheless, the Justices advised that the act authorized state debt in violation of constitu-

---

135 Ohio St 604; 22 NE2d 200, 206–207 (1939); *Hively v School City of Nappanee,* 202 Ind 28; 169 NE 51, 53 (1929); *State Office Building Commission v Trujillo,* 46 NM 29; 120 P2d 434, 448–449 (1941); *State ex rel Hall v Taylor,* 154 W Va 659; 178 SE2d 48, 58 (1970); *In the Matter of Constitutionality of Ch 280, Oregon Laws 1975,* 276 Or 135; 554 P2d 126, 131–132 (1976). *See, also,* Morris, *Evading Debt Limitations with Public Building Authorities: The Costly Subversion of State Constitutions,* 68 Yale LJ 234, 249–250 (1958).

[28] The Court held that Const 1850, art 14, §§ 7, 8 and 9, precluded the state from authorizing townships, cities and villages to do what it could not do itself. These and companion provisions of the 1850 Constitution have been carried forward and are the limitations now before us.

The Court rejected decisions in other states "which were supposed to sanction the doctrine that, under such circumstances, the state might do indirectly through its subdivisions what directly it was forbidden to do". *People ex rel Bay City v State Treasurer,* 23 Mich 499, 505 (1871).

tional limitations. *Advisory Opinion re Constitutionality of 1973 PA 1 & 2, supra,* 175, 179–180.

Words in a constitution "do not receive a narrow, contracted meaning, but are presumed to have been used in a broad sense, with a view of covering all contingencies". *In the Matter of Strauss,* 197 US 324, 330; 25 S Ct 535; 49 L Ed 774 (1905). "Narrow and technical reasoning is misplaced when it is brought to bear upon an instrument framed by the people themselves, for themselves, and designed as a chart upon which every man, learned and unlearned, may be able to trace the leading principles of government." 1 Cooley, Constitutional Limitations (8th ed), pp 131–132. Similarly, see *Traverse City School District v Attorney General,* 384 Mich 390, 405; 185 NW2d 9 (1971). "A constitution, establishing a frame of government, declaring fundamental principles, and creating a national sovereignty, and intended to endure for ages and to be adapted to the various crises of human affairs, is not to be interpreted with the strictness of a private contract." *Legal Tender Case,* 110 US 421, 439; 4 S Ct 122; 28 L Ed 204 (1884).

These principles apply with equal force whether the question concerns a provision granting or limiting legislative power. "The true spirit of constitutional interpretation in both directions is to give full, liberal construction to the language, aiming ever to show fidelity to the spirit and purpose." *Fairbank v United States,* 181 US 283, 289; 21 S Ct 648; 45 L Ed 862 (1901).[29]

---

[29] "If powers granted are to be taken as broadly granted and as carrying with them authority to pass those acts which may be reasonably necessary to carry them into full execution; in other words, if the Constitution in its grant of powers is to be so construed that Congress shall be able to carry into full effect the powers granted, it is equally imperative that where prohibition or limitation is placed upon the power of Congress that prohibition or limitation

State authorities and moral obligation bonds
with makeup provisions were unknown when the
constitutional limitations took form in 1850.[30] "[I]n
determining whether a provision of the Constitu-
tion applies to a new subject matter, it is of little
significance that it is one with which the framers
were not familiar. For in setting up an enduring
framework of government they undertook to carry
out for the indefinite future and in all the vicissi-
tudes of the changing affairs of men, those funda-
mental purposes which the instrument itself dis-
closes. Hence we read its words, not as we read
legislative codes which are subject to continuous
revision with the changing course of events, but as
the revelation of the great purposes which were
intended to be achieved by the Constitution as a
continuing instrument of government. [Citations
omitted.] If we remember that 'it is a Constitution
we are expounding,' we cannot rightly prefer, of
the possible meanings of its words, that which will
defeat rather than effectuate the constitutional
purpose." *United States v Classic,* 313 US 299, 316;
61 S Ct 1031; 85 L Ed 1368 (1941). "Words, espe-
cially those of a constitution, are not to be read
with such stultifying narrowness." *Id,* 320.

## V

The purpose of the debt and credit[31] limitations

should be enforced in its spirit and to its entirety. It would be a
strange rule of construction that language granting powers is to be
liberally construed and that language of restriction is to be narrowly
and technically construed." *Fairbank v United States,* 181 US 283,
289; 21 S Ct 648; 45 L Ed 862 (1901).

[30] *See* fn 28, *supra.*

[31] "The framers of the 1963 Constitution created a pay-as-you-go
government for the State of Michigan. In furtherance of that scheme,
the State of Michigan is specifically prohibited from becoming a
guarantor or surety for anyone. It would be an obviously useless thing
for the Constitution to prohibit the State from borrowing money and

is to bar the Legislature, without a vote of the people, from incurring, on the credit of the state's general taxing power, obligations payable in the future.

"Although governments usually are not considered weak bargainers, the constitutional debt limit is based upon the premise that, in matters of finance, they are often imprudent. A legislature or municipality, caught between the popular pressures for new developments and against additional taxes, may attempt to escape through excessive borrowing. Not unlike equity's solicitude for the mortgagor, debt limits reflect a determination by the framers and ratifiers of state constitutions that governments are congenital borrowers who often deal unwisely." Morris, *Evading Debt Limitations with Public Building Authorities: The Costly Subversion of State Constitutions,* 68 Yale LJ 234, 247 (1958).

What may not be done at all may not be done by indirection.[32] In an early debt limitation case this Court said: "Constitutions do not change with the

then permit the State to incur liabilities by becoming party to the borrowing of others. Thus, article 9, § 18, of the Constitution provides:

" 'The credit of the state shall not be granted to, nor in aid of any person, association or corporation, public or private, except as authorized in this constitution.'

"The purpose of this provision is to make certain that the State, which itself cannot borrow, except as authorized, does not accumulate unauthorized debts by indorsing or guaranteeing the obligations of others." *Advisory Opinion re Constitutionality of PA 1966, No 346,* 380 Mich 554, 563–564; 158 NW2d 416 (1968).

The only change in the credit provision made by the 1963 Constitution was the addition of the phrase "except as authorized in this constitution". It was explained in the accompanying commentary that "[t]he first sentence [of the credit clause] is a revision of § 12, art 10 of the present constitution adding these words, 'except as authorized in this constitution.' This exception is needed to put the section having to do with school borrowing and this section in harmony". *Address to the People,* 2 Official Record, Constitutional Convention 1961, p 3401. *See also* 1 Official Record, Constitutional Convention 1961, pp 603–604.

[32] *See* fn 28, *supra.*

varying tides of public opinion and desire; the will
of the people therein recorded is the same inflexi-
ble law until changed by their own deliberative
action; and it cannot be permissible to the courts
that in order to aid evasions and circumventions,
they shall subject these instruments, which in the
main only undertake to lay down broad general
principles, to a literal and technical construction,
as if they were great public enemies standing in
the way of progress, and the duty of every good
citizen was to get around their provisions when-
ever practicable, and give them a damaging thrust
whenever convenient. They must construe them as
the people did in their adoption, if the means of
arriving at that construction are within their
power." *People ex rel Bay City v State Treasurer,
supra,* 506.

More recently it was observed regarding the
debt and credit limitations:

"We are not disposed to extend exceptions to this
constitutional limitation. Each extension seems to in-
vite another. Given the ingenuity of those who urge
avoidance of the limitation, we could effectively elimi-
nate it altogether by extending exceptions to it.

\* \* \*

"The question is not whether the state has pledged its
full faith and credit to pay the notes to be issued by the
State Treasurer, but whether the notes are state indeb-
tedness. The framers used the term 'full faith and
credit' in §§ 14 and 16 of art 9 and the term 'general
obligation bonds' in § 16 of art 9. If they intended to
prohibit only the issuance of general obligation bonds
or full faith and credit obligations presumably they
would have used those terms in § 12 of art 9 rather
than the term 'state indebtedness.'" *Advisory Opinion
re Constitutionality of 1973 PA 1 & 2, supra,* 177, 179.

It is worthy of note that there were unsuccessful

efforts at the 1961 Constitutional Convention to amend the credit limitation to except a grant of state credit up to one hundred million dollars for public benefit corporations for the purpose of financing industrial, manufacturing and municipal development projects.[33] The proponents, as do the proponents here, argued that it was necessary and in the public interest to create such corporations to attract new businesses, to encourage businesses to remain in the state, and to increase employment opportunities. Other proposals to narrow the credit clause were also defeated.[34]

Shortly before the 1961 Constitutional Convention the people defeated a proposal to amend the 1908 Constitution to provide: "The credit of the state, up to $5,000,000.00, may be granted, and only at the direction of a legislative act, to or in aid of public benefit corporations for the purpose of financing industrial, manufacturing and municipal development projects in this state."[35]

The Legislature is authorized, with the assent of

---

[33] The proposed amendment provided:

"The credit of the state, up to a sum of $100,000,000, may be pledged or granted to or in aid of public benefit corporations, for the purpose of financing industrial, manufacturing and municipal development projects in this state: Provided however, That any such extension of credit shall require for approval a formal act of the legislature." 1 Official Record, Constitutional Convention 1961, p 623.

The proposal was defeated by a vote of 84 to 39 (id, p 629), and later by a vote of 93 to 40 (id, p 632).

[34] Another amendment defeated on the floor would have provided that the credit of the state shall not be granted "except as authorized by law". 1 Official Record, supra, p 629. Other amendments were rejected in committee; included were proposals to except loans to improve or bring industry to the state, and to permit a grant of credit "for purposes of health, safety, and general welfare." In rejecting these proposals it was observed that "those terms are interpreted so broadly that you might just as well take the provision out of the constitution. There is very, very little that the state would want to do that you cannot include under the words 'health, safety and general welfare' ". Id, p 623.

[35] 1961 Public and Local Acts, p 760.

two-thirds of its members, to appropriate public money or property for a private purpose. Const 1963, art 4, § 30.[36] The Legislature may accordingly, whether the purpose or activity of the authority is public or private, endow the authority out of current revenue.[37] Without a vote of the people, however, it may not effectively pledge the general taxing power.

Self-liquidating revenue bonds do not violate the debt limitations, not because of disclaimers, but because purchasers and the market understand that no pledge of general tax revenue is involved. If there is a default, bondholders have no complaint if the state does not make up the deficiency. There is no constraint on the state to do so.

Underlying the proponents' argument is the assumption, unsupported by any evidence of which we have been made aware, that the obligations of the authority can be underwritten and marketed to the public and that its guarantees will be accepted by the financial community solely on the strength of revenue projections of indeterminate and perhaps problematic projects. Also underlying

---

[36] This provision was also first adopted in 1850. Const 1850, art 4, § 45.

[37] Appropriations are not involved in the instant matter. There is no need to consider whether the projects that may be financed by the authority are prohibited works of internal improvement. If obligations of the authority are of the nature of self-liquidating revenue bonds, then without regard to whether the projects are prohibited works of internal improvement the state would not be financially interested in them (see fn 24, supra) and if they are not of that nature they violate the debt and credit limitations.

The legislative determination that this program is necessary for the promotion of the public welfare does not mandate the conclusion that resulting internal improvements are public. All acts of the Legislature presumably promote the public welfare but that premise does not insulate them from judicial review for constitutionality. The entire concept and process of judicial review would be without foundation if the Legislature could, by its own declaration, determinatively conclude the meaning to be ascribed to the Constitution. See Marbury v Madison, 5 US (1 Cranch) 137; 2 L Ed 60 (1803).

their argument is the assumption that a failure of the Legislature to respond affirmatively to a certification from the chairman of the authority that a make-up appropriation is necessary to prevent a default would not significantly affect the market for Michigan securities and, therefore, the Legislature truly has discretion to respond affirmatively or negatively. The validity of those assumptions is not a question of constitutional law or of law at all, but a question of fact.

In the instant matter, in contrast with the earlier opinions on hospital bonds[38] and public housing bonds,[39] there is no basis for indulging assumptions regarding the marketability of these bonds or the willingness of financial institutions to accept loan guarantees independent of any commitment of the state's power of taxation. Foote Hospital was long established and revenue projections presumably fully supported the contemplated bond issue.[40] Housing authority obligations may similarly be supported by routine revenue projections; the experience has been favorable.[41]

The Job Development Authority is expected to make loans to new and untested enterprises. The purpose of alleviating and preventing unemployment may involve the authority in financing projects with uncertain prospects and revenue projections. The loans guaranteed may be those that financial institutions would be unwilling to make but for the guarantee.

While a testimonial hearing may establish that

---

[38] *W A Foote Memorial Hospital, Inc v Jackson Hospital Authority,* 390 Mich 193; 211 NW2d 649 (1973).

[39] *Advisory Opinion re Constitutionality of PA 1966, No 346, supra.*

[40] *See* Phalon, *Personal Investing: Booming Tax-Exempt Hospital Bonds,* New York Times, May 7, 1977, p 11.

[41] Michigan State Housing Development Authority, 1976 Annual Report, p 8.

the market would accept authority obligations without a make-up provision and the accompanying statements of "further assurance" and "policy of this state" that deficiencies in the capital reserve and loan guarantee funds "may" be funded by legislative appropriations, on a full factual record it may appear that the authority's obligations would not be accepted and, therefore, could not be underwritten or marketed except on the strength of such expressions of further assurance and state policy.

On a full factual record it may also appear that although in form the Legislature has discretion, in actuality it does not. At present there are approximately 1-1/2 billion dollars of outstanding state obligations, and an additional 7-1/2 billions in obligations of school districts and municipalities and other local units of government. If it were to appear that a failure of the Legislature to make up deficiencies with appropriations to the capital reserve or loan guarantee funds would expose the holders of such securities to financial loss, would have an adverse effect on the market for Michigan securities, and would make it more difficult and expensive to refinance outstanding obligations and market securities in the future, what is in form discretionary could in substance be an effective commitment. By establishing the authority and authorizing bonds, notes and loan guarantees, the Legislature would then have set in motion forces which oblige future Legislatures to provide funds to make up deficiencies under the constraint of adverse implications for the holders of state obligations and consequent impairment of the borrowing capacity of the state and its subdivisions.

Such constraints on future Legislatures and the people would not create a moral obligation only. If

a tacit understanding has evolved which, because of market forces, the Legislature cannot fail to honor, the act, despite disclaimers, would be an effective commitment tantamount to an express commitment within the spirit and purpose of the constitutional limitations.

A conclusion that the act violates the constitutional limitations, or that authority obligations are not or would not be valid, would not preclude pursuit of the goal of providing increased employment opportunities through governmental subvention of industrial buildings, machinery and equipment; it would mean that if that goal is to be financed with borrowed money an approving vote of the people is required or the projects financed must support revenue projections without an effective commitment of the general taxing power.

RYAN, J., concurred with LEVIN, J.

WILLIAMS, J. I concur with my Brother LEVIN. I do so principally because of the interaction of two factors. The first factor is that the Job Development Authority Act deals with bond risks that are different from the secure risks of traditional revenue bonds that the bond buyer can rely on, such as the Blue Water Bridge, the Mackinac Bridge, hospitals, public housing, City-County Building, Detroit, etc., in each of which there was either a firm revenue record or sound engineering revenue projections. The second factor is the very strong emphasis in the act that the Legislature may in the future appropriate to maintain the capital reserve fund at a level to meet bond payments. 1975 PA 301, §§ 31–48 and 61. In my mind the first factor alone is not critical but interacting with the record it creates a situation where reliance is only partially on revenues and thus par-

tially on the credit of the state to the extent that the bonds are not revenue bonds and the act is constitutionally invalid.

Blair Moody, Jr., J., took no part in the decision of this case.